698 F.2d 775
 8 Collier Bankr.Cas.2d 186, Bankr. L. Rep. P 69,089,
30 Cont.Cas.Fed. (CCH) 70,845
In the Matter of GARY AIRCRAFT CORPORATION, Debtor.
GARY AIRCRAFT CORPORATION, et al., Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 81-1391.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 25, 1983.
 
 Richmond I. McKay, J. Christopher Kohn, Attys., Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellant.
 Gilpin, Maynard, Parson, Pohl, Bennett, John H. Bennett, Jr., Houston, Tex., for Gary Aircraft.
 Joe Warren Jones, San Antonio, Tex., for creditors committee.
 Appeal from the United States District Court for the Western District of Texas.
 Before GOLDBERG, GEE and HIGGINBOTHAM, Circuit Judges.
 GOLDBERG, Circuit Judge:
 
 
 1
 This is a stretch case with potential for elastic juridical power in either the bankruptcy court or the Armed Services Board of Contract Appeals. In this appeal we are called upon to review various matters pertaining to the liquidation by a bankruptcy court of claims by the United States against Gary Aircraft Corporation ("Gary") flowing from a contract between the government and Gary to overhaul airplane engines.[1] We hold that the bankruptcy court improperly exercised its jurisdiction in liquidating the contract claims and that it should have deferred jurisdiction for the purpose of liquidation to the Armed Services Board of Contract Appeals.
 
 I. INTRODUCTION
 
 2
 A. Facts--Government Reservations and the Engines
 
 
 3
 Gary entered into a contract with the United States Air Force to rebuild Model 2800 aircraft engines, effective as of December 1, 1970. Under the contract Gary was supplied with materials from various government sources to use in the rebuilding process. Beginning in late 1973, the General Accounting Office developed some doubts regarding Gary's handling of government furnished property. The first contract, after extensions, expired on August 31, 1974. Despite the GAO problems, Gary was awarded a second contract to perform the same services beginning September 1, 1974.
 
 
 4
 During August, 1974, the GAO told the Air Force that drastic measures were needed to protect the government's interests. In response, the Air Force sent a fifty person team to Gary's plant. The team imposed some stringent property and quality control procedures, which appear to have had the effect of severely disrupting Gary's work. Consequently, Gary was unable to meet its delivery deadlines and the government terminated the second contract for default in March of 1975.
 
 B. Procedural History
 
 5
 The contracts between Gary and the government contained the standard disputes clause, establishing a heirarchy for resolving disputes arising under the contract. First, the Contracting Officer would address the dispute. Second, the Armed Services Board of Contract Appeals ("ASBCA") would hear the case. Third, the case could go to the Court of Claims under the Wunderlich Act, 41 U.S.C. Secs. 321, 322 (1976).
 
 
 6
 Gary first filed claims under both contracts for the additional costs caused by government changes in the contract. These claims were filed with the Contracting Officer who decided against Gary. The matter was docketed by the ASBCA on January 21, 1977, together with other claims on the contracts. The ASBCA scheduled a hearing for October 3, 1977.
 
 
 7
 This orderly procedure was complicated on October 28, 1976, when Gary filed under Chapter XI of the Bankruptcy Act of 1898, as amended, 11 U.S.C. Secs. 1-151326 (1976 & Supp.1979). The government filed proofs of claims which Gary moved to disallow in June, 1977. The bankruptcy court set a trial date for the claims for July 18, 1977. The government filed a Motion to Stay and Vacate the bankruptcy court proceedings on July 7, 1977. A hearing on the Motion to Stay was held July 18, 1977. From July 19, 1977 to March 9, 1978, the bankruptcy court heard the testimony on the merits of the government's claims and related issues. This produced a transcript of some 17,000 pages. On February 22, 1979, the bankruptcy court denied, finally, the government's Motion to Stay and Vacate. On June 29, 1979, the bankruptcy court essentially adopted Gary's proffered 1,107 Findings of Fact and Conclusions of Law, covering some 383 pages.
 
 
 8
 The bankruptcy court determined that the government basically had caused Gary's default, thus the termination for default was viewed as a termination for the convenience of the government. The government's claim was valued at $59,166.06. In order to determine whether the government's claim was entitled to priority over other creditors, the bankruptcy court had to determine whether Gary was solvent. The only substantial asset Gary had was its claim against the government for termination for convenience of the second contract. The bankruptcy court valued this claim at $3,170,724. The bankruptcy court did not purport to be entering a judgment against the government, but merely to be making collateral findings necessary to resolve the question of priority. The government appealed the bankruptcy court's decision to the district court on September 11, 1979; the district court affirmed the bankruptcy court on June 24, 1981. This appeal followed.
 
 
 9
 Meanwhile, things were still going on back at the ASBCA and Court of Claims. On August 30, 1978, the ASBCA dismissed Gary's appeals without prejudice. On August 1, 1980, on the strength of the bankruptcy court's findings, Gary filed a petition in the Court of Claims for recovery on its claim against the government. Additionally, Gary petitioned for recovery of legal fees, lost profits, consequential damages and so on. On January 9, 1981, the Court of Claims dismissed Gary's claim for legal fees and stayed the remainder pending exhaustion of administrative remedies in the ASBCA. On August 28, 1981, Gary reinstated its appeals before the ASBCA. Those appeals are still pending waiting for this Court's resolution of the government's appeal before us.
 
 C. Issues on Appeal
 
 10
 The government on appeal raises two jurisdictional arguments and two groups of substantive government contract law arguments. First, the government argues that the bankruptcy court should have deferred to the ASBCA for liquidation of all of these claims. Second, the government argues that the bankruptcy court need not have precisely valued Gary's claim against the government. Finally, the government argues the bankruptcy court erred in its valuation of the government's claim against Gary and Gary's claim against the government.
 
 
 11
 We agree with the government that the bankruptcy court improperly exercised jurisdiction over the liquidation of these government contract claims.[2] We shall first address the nature of the mechanisms for resolution of government contract disputes. Next, we probe the inner reaches of the bankruptcy process. Finally, we shall mediate between the immovable object and the irresistible force.
 
 
 12
 II. RESOLUTION OF GOVERNMENT CONTRACT DISPUTES
 
 
 13
 Before turning to the core question of whether the bankruptcy court or the ASBCA should liquidate the government contract claims, we must first delve a little deeper into the nature of governmental dispute resolution. More specifically, we are concerned with how the ASBCA gets its customers, by what right the ASBCA resolves disputes. The parties present two polar positions, believing that the correct characterizations of the disputes clause is dispositive of the jurisdictional issue. See infra Part IV.C.1. On one hand, the government believes the disputes clause is as binding as if it were statutorily mandated; on the other hand, Gary believes the disputes clause is of no more force than an arbitration clause in a contract between two private parties. We find, on the third hand, that an intermediate view is most compelling; accordingly, our characterization of the disputes clause is not automatically dispositive of the jurisdictional issue. See infra Part IV.C.2.
 
 
 14
 The government's most aggressive position is that the disputes clause is, in effect, statutorily mandated. The government claims that the Armed Services Procurement Act, 10 U.S.C. Secs. 2202-2774 (1976), which provides the authority to issue the Armed Services Procurement Regulations ("ASPR"). ASPR Sec. 7-203.12, 31 C.F.R. Sec. 7-3.12 (1976), mandates the dispute clause in question. Thus, the dispute clause is, in effect, congressionally mandated. The Court of Claims has held, in fact, that this line of reasoning results in contracts being read as if they contained required clauses, even when the actual contract did not. G.L. Christian & Assoc. v. United States, 312 F.2d 418, 424 (Ct.Cl.), cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 315 (1963). See also Chris Berg, Inc. v. United States, 426 F.2d 314, 317 (Ct.Cl.1970).[3]
 
 
 15
 We do not agree with the government's analysis. It is worth noting that the Contract Disputes Act of 1978, 41 U.S.C. Secs. 601-613 (Supp.1979) does indeed make the disputes clause statutorily mandated, but that was not in effect at the time of the contracts in question here. Our initial point of disagreement is that we find no specific authority in the Armed Services Procurement Act for the ASPRs. Indeed, the Legislative history of the Contract Disputes Act of 1978 notes that "[b]asically the methods and forums for handling such disputes exist by executive branch fiat--that is, by the insertion of contract terms specifying how disputes in specific areas will be resolved--and by agency regulations governing the procedural and substantive adjudication of disputes." S.Rep. No. 1118, 95th Cong., 2d Sess. 2 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 5235, 5236. See also S & E Contractors, Inc. v. United States, 406 U.S. 1, 18, 92 S.Ct. 1411, 1421, 31 L.Ed.2d 658 (1972) (Boards of Contract Appeals "are not statutory creations but are established by administrative regulations. S.Doc. No. 99, 89th Cong., 2d Sess., Operation and Effectiveness of Government Boards of Contract Appeals 20-21."). Many cases hold that dispute clauses gain their compelling force through contractual agreement. See, e.g., Patton Wrecking and Demolition Co. v. TVA, 465 F.2d 1073 (5th Cir.1972), Bethlehem Steel Corp. v. Grace Line, Inc., 416 F.2d 1096, 1105-06 (D.C.Cir.1969). In summary, we do not view the dispute clause as having the force of congressional enactment.
 
 
 16
 Gary takes the complementary extreme position that because the dispute clause gains its force through contractual agreement, it is merely a contractual clause. We believe this conclusion is not supported by law, logic, or common sense. First, the logical underpinnings of the conclusion are flawed. The fact that Gary became subject to the dispute clause by contractual agreement does not entail the conclusion that all the consequences of the dispute clause are "merely" contractual and of little moment. After all, the Constitution is "merely" the product of agreement by the citizens and governments of the thirteen colonies.
 
 
 17
 Second, the fact that dispute clauses were not statutorily mandated does not mean that they have no official stature. Congress was certainly cognizant of the existence of dispute clauses and at the least condoned them. See, e.g., United States v. Moorman, 338 U.S. 457, 460, 70 S.Ct. 288, 290, 94 L.Ed. 256 (1950) ("Contractual clauses such as these have long been used by the Government. No congressional enactment condemns their creation or enforcement."). In fact, the only enacted evidence of congressional knowledge of dispute clauses, the Wunderlich Act, 41 U.S.C. Secs. 321, 322 (1976), providing for judicial review of Board of Contract Appeals decisions, suggests at least tacit approval. As the Supreme Court has said, a dispute clause
 
 
 18
 is something more than a dead letter to be revived only at the convenience or discretion of the contractor. It is a clear, unambiguous provision applicable at all times and binding on all parties to the contract. No court is justified in disregarding its letter or spirit.... This mechanism, moreover, is exclusive in nature. Solely through its operation may claims be made and adjudicated as to matters arising under the contract.
 
 
 19
 United States v. Joseph A. Holpuch Co., 328 U.S. 234, 239-40, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192 (1946) (citations omitted, emphasis added). This is something more than mere contractual verbiage.
 
 
 20
 Finally, and perhaps most importantly, common sense suggests it is a bit disingenuous to treat the dispute clause as just another binding arbitration clause in a contract between two parties. One has merely to look at the vast body of case law, digests, and treatises to realize that government contracting law is complex, technical, esoteric, important and monumental. The raison d'etre of the various Boards of Contract Appeals is that both expertise and uniformity are needed to resolve adequately and fairly questions within the purview of government contracting law. The keystone of this entire edifice is the dispute clause--hardly just another contract clause.
 
 
 21
 The parties have attempted to confine our choices by classifying the dispute clause along a spectrum from private law to public law, with their preferences at the two extreme ends of the spectrum. Our quarrel lies not so much with the extremities as with the spectrum. Focusing on the dispute clause unduly narrows the scope of our inquiry. The dispute clause itself is undoubtedly a creature of contract. The clause, however, is but one creature in the zoo of government contracting. To compare the nature of the triggering event of government contract dispute resolution, a purely contractual clause, with the nature of the entire process is to compare appaloosas and orangutans.
 
 III. BANKRUPTCY
 
 22
 Before investigating the overlap between bankruptcy and government contract dispute resolution we must briefly examine the great American institution of bankruptcy. Bankruptcy serves a role in corporate life eerily similar to that of the doctrine of reincarnation in some eastern religions. Bankruptcy is the belief that the souls of a corporate entity, the equityholders, do not just vanish when their corporeal form dies. Rather, they learn from the mistakes of a previous incarnation and can once again live on the earth in corporate form. True, they may suffer for the sins of previous incarnations and have trouble raising venture capital, but such is the karmic burden. With luck, some day a corporation may achieve enlightenment and reach a plane of eternal bliss and nirvana--the Fortune 500.
 
 
 23
 Though the relatives of a departed soul may receive intellectual comfort at the thought of reincarnation, they are often more touched by the pain and immediacy of their personal loss. Just as it is in life, so it is in bankruptcy. The close cousins of the equityholders, the debtholders, take little spiritual comfort from the knowledge that the equityholders may someday be reincorporated. Instead, they are more aware of the anguish of their personal loss, the money they loaned the deceased corporation.
 
 
 24
 It is at this point that the black robed judge steps in as the saffron robed monk and comforter. Perhaps the corporation has left behind some small amount of worldly goods, some trinkets to remind the debtholders of their friendship with the departed. Ah, but how to divide the estate so that everyone can have some little item of memorabilia?
 
 
 25
 This is a question of great spiritual and temporal import. Fortunately, the sacred writings can provide guidance and inspiration. It is written in United States Code, volume 11, section 11, (1976), that bankruptcy judges have great latitude in comforting those left behind. These words, like any sacred writings, may be read in different ways by different people. Happily, we have an authoritative exegesis to guide us in our interpretation.
 
 
 26
 Among the granted powers [of bankruptcy judges] are the allowance and disallowance of claims; the collection and distribution of the estates of bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part "according to the equities of the case" of claims previously allowed; and the entering of such judgments "as may be necessary for the enforcement of the provisions" of the act. In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts."
 
 
 27
 Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) (emphasis added, footnotes omitted).
 
 IV. WHEN WORLDS COLLIDE
 
 28
 We have been presented with two inclusive, exclusive, sweeping schemes, both of which the Supreme Court has endorsed. The disputes clause is something that no court can disregard. Bankruptcy courts have jurisdiction exclusive of all other courts. Given such conflicting mandates, what is a poor circuit judge to do?
 
 
 29
 The standard statement of the rule regarding a bankruptcy court's summary jurisdiction to liquidate claims is that bankruptcy judges may, in their discretion, defer a claim to another tribunal for liquidation. See, e.g., 11 U.S.C. Sec. 93(d) (1976) (allowing bankruptcy court to specify manner of liquidation of unliquidated claims); 3 Collier on Bankruptcy p 57.15[3.2] (14th ed. 1977). In resolving whether the bankruptcy court below properly exercised its jurisdiction, we shall make a three-stage inquiry. First, we will consider what it means to say that the resolution of a question is discretionary. Second, we will examine the guidance given us by three Supreme Court decisions on exercise of bankruptcy jurisdiction. Third, we will mediate between the ASBCA and bankruptcy court.
 
 A. On the Nature of Discretion
 
 30
 The discretion of a judge is said by Lord Camden to be the law of tyrants; it is always unknown, it is different in different men; it is casual, and depends upon constitution, temper, and passion. In the best, it is oftentimes caprice; in the worst, it is every vice, folly, and passion to which human nature is liable.
 
 
 31
 1 J. Bouvier, Bouvier's Law Dictionary 885 (F. Rawle ed. 1914).
 
 
 32
 Fortunately, this rather bleak view is not the only insight we have into the nature of discretion. Chief Justice Marshall said on this subject:
 
 
 33
 Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law and will nothing. When they are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the legislature; or, in other words, to the will of the law.
 
 
 34
 Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 740, 866, 6 L.Ed. 204 (1824).
 
 
 35
 Marshall's is a much more helpful concept of discretion. Discretion does not imply complete freedom to choose a decision, but rather an area of the law that has not matured enough to provide a rule of decision. Within an area of discretion, as yet uncluttered by particular rules, a judge is charged with determining what decision is dictated by more general rules of law.
 
 
 36
 Holding that a type of decision is subject to discretion is not necessarily an eternal statement of the law, but rather a comment on the state of the law at that time. What was once a virgin terrain of discretion may become spotted with landmarks of rules as decisions are made. "The life of the law has not been logic; it has been experience." O. Holmes, The Common Law 5 (M. Howe ed. 1968). As experience with an area of the law develops, what was once discretionary may become restricted by a general rule, then qualified by exceptions, and then littered with exceptions to the exceptions. Discretion in areas of the law existing due to those areas' immaturity we shall call "discretion by default."
 
 
 37
 This progress from discretion to rule is not inevitable, however. In some cases, as courts gain experience with an area of the law, they may decide it is inappropriate to govern that area by rules. It is the nature of a rule to prescribe a uniform treatment for a class of cases; for such a rule to be useful the class of cases must share enough salient characteristics to justify being treated as a group.[4] If an area of the law is too fact-specific, if the cases do not share enough important characteristics, it would be pointless to have a rule and the courts then may affirmatively decide to leave that area permanently to discretion. This kind of discretion we shall call "discretion by choice."
 
 
 38
 Thus, in reviewing an exercise of discretion, we must always ask an antecedent question: Is this decision truly discretionary? In the particular field of the jurisdiction of a bankruptcy court to decide collateral questions, we find some narrowing of the area of discretion in three Supreme Court decisions.
 
 B. Supreme Court Balancing
 
 39
 On three occasions the Supreme Court has held that bankruptcy jurisdiction should yield to the expertise of an administrative tribunal. In Order of Railway Conductors v. Pitney, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946), the Court held that a railroad reorganization court should not have decided a dispute between two rival unions regarding which union had the right to conduct trains of the bankrupt inside and outside railroad yards. The Court in part relied on the Railway Labor Act, 45 U.S.C. Secs. 151-188, which gave the Railway Labor Adjustment Board jurisdiction over such controversies.
 
 
 40
 Smith v. Hoboken Railroad Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946), held that the reorganization court should have deferred to the Interstate Commerce Commission for it to decide whether a bankrupt railroad had forfeited its right to leased tracks. Again, the Court relied on statutory enactments. Section 1(18) of the Interstate Commerce Act, 49 U.S.C. Sec. 1(18) provided that no railroad shall abandon its track without first obtaining a certificate of public convenience and necessity from the Commission. Furthermore, section 77 of the Bankruptcy Act, 11 U.S.C. Sec. 205, "leaves no doubt that Congress did not mean to grant to the district courts [in bankruptcy] the same scope as to bankrupt roads that they may have in dealing with other bankrupt estates." Smith, supra, 328 U.S. at 133 n. 5, 66 S.Ct. at 953 n. 5 (quoting Palmer v. Massachusetts, 308 U.S. 79, 87, 60 S.Ct. 34, 38, 84 L.Ed. 93 (1939)).
 
 
 41
 Most recently, though not very recently, in Nathanson v. NLRB, 344 U.S. 25, 73 S.Ct. 80, 97 L.Ed. 23 (1952), the Court held that the bankruptcy court must defer to the NLRB for liquidation of unfair labor practice claims. The NLRB had found the employer guilty of unfair labor practices and ordered payment of back wages. While an action to enforce the order was pending in the court of appeals, an involuntary bankruptcy petition was filed against the employer. The court of appeals subsequently enforced the NLRB order and the NLRB filed a claim in bankruptcy. The bankruptcy court denied the claim and the Supreme Court reversed on the following rationale:
 
 
 42
 The bankruptcy court normally supervises the liquidation of claims. But the rule is not inexorable. A sound discretion may indicate that a particular controversy should be remitted to another tribunal for litigation. And where the matter in controversy has been entrusted by Congress to an administrative agency, the bankruptcy court normally should stay its hand pending an administrative decision.... It is the Board, not the referee in bankruptcy nor the court, that has been entrusted by Congress with authority to determine what measures will remedy unfair labor practices.
 
 
 43
 Id. at 30, 73 S.Ct. at 83 (citations omitted). Now we must decide how these three decisions suggest that we mediate the conflict between the ASBCA and bankruptcy court.
 
 C. Bankruptcy Court v. ASBCA
 
 44
 Finally we have the necessary predicate to mediate between the bankruptcy court and the ASBCA. We have some basic understanding of the nature of the two institutions, we know a little better what it means to say that a bankruptcy court may, in its discretion, allow another court to liquidate claims, and we know of three occasions where the Supreme Court has held that a bankruptcy court should have deferred.
 
 
 45
 The bankruptcy court below made detailed findings to support its determination that it should not defer. If the question facing us today were simply whether the bankruptcy court abused its discretion in making that determination, we would clearly have to hold that it did not; the bankruptcy court's decision was neither arbitrary nor capricious, but rather deliberate and reasoned. We do, however, have an antecedent question: Was this decision a truly discretionary decision? Was this discretion by choice?
 
 
 46
 1. The Supreme Court Trilogy.--The first inquiry in determining whether the decision was truly discretionary is to determine whether the trilogy of Supreme Court cases discussed above has enunciated a rule of decision controlling the present case. The parties to the present case viewed these three Supreme Court cases as holding essentially that when Congress has committed a type of decision to a specialized tribunal, a bankruptcy court should defer. This view of the three cases explains why the parties disagreed so sharply over the characterization of the ASPRs, the disputes clause, and the ASBCA as being creatures of Congress or the product of a private law contractual agreement. If the mechanisms of government dispute resolution are congressionally created, the case lies within the rule of the trilogy of Supreme Court cases, and not within the bankruptcy judge's discretion.
 
 
 47
 In discussing the mechanisms of governmental contract dispute resolution, supra Part II, we found that they were not congressionally mandated. Thus, we do not view this case as being within the rule of the trilogy of Supreme Court cases.
 
 
 48
 2. Time for a Rule.--Gary would have us read these three Supreme Court cases as also standing for their negative pregnant--if Congress has not specifically committed a particular class of disputes exclusively to a specialized agency, then those disputes are within the free discretion of the bankruptcy court to adjudicate. As we discussed earlier, a decision may be discretionary for two reasons. It may be discretionary because the field has not matured enough for there to be rules governing everything--discretion by default--or it may be discretionary because of an affirmative judgment that it is not amenable to a rule--discretion by choice. It is our view that the three Supreme Court cases do not represent an affirmative judgment that cases are permanently committed to discretion by choice unless they are committed by Congress exclusively to a specialized tribunal. And so we must now decide whether liquidation of a government contract claim should be given over to discretion by choice.
 
 
 49
 Congress initially gave over to discretion the question of whether a bankruptcy judge should defer to another tribunal for resolution of a particular issue. This discretion is not unguided, however; it has both latitudinal and longitudinal dimension. It is neither cosmic nor omniscient, but rather discretion guided by "the will of the law." In determining the will of the law, we are guided by the broad principles of bankruptcy. The three Supreme Court cases represent a judgment that in a particular class of disputes, judgments committed by Congress to the exclusive expertise of an administrative body, the broad principles of bankruptcy would consistently lead to one particular decision, i.e., the bankruptcy court should defer. Thus that formerly discretionary question was an appropriate subject for a rule of decision. We are now faced with a similar question: Should there be a jurisdictional rule regarding government contract disputes before the ASBCA?
 
 
 50
 To determine whether a rule is appropriate, we must look to the nature of the two processes involved. The primary purpose of a proceeding in bankruptcy is to ensure that all creditors are treated fairly.[5] This primary purpose makes it absolutely essential that all claims be satisfied in one forum. The ancillary jurisdiction of a bankruptcy court to liquidate claims, however, involves more nearly the administrative convenience of settling all disputes in a single forum; it just is not as vital to the purpose of bankruptcy. So, for example, we are told that in proper circumstances bankruptcy courts should defer unsettled questions of state law to state courts. Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 483, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940). See also First State Bank and Trust Co. v. Sand Springs State Bank, 528 F.2d 350, 354 (10th Cir.1976) ("Bankruptcy courts should be reluctant to entertain questions which may be equally well resolved elsewhere."). Furthermore, though Smith, Order of Railway Conductors, and Nathanson do not specifically control this case, they at least can stand for the general proposition that a bankruptcy court should defer a complicated, technical dispute to a specialized forum.
 
 
 51
 Given these generalized ideas about a bankruptcy court's ancillary jurisdiction, we must now investigate whether they justify articulating a general rule for resolution of government contract disputes pending before a Board of Contract Appeals. First, allowing a Board of Contract Appeals to liquidate claims arising out of a government contract would not impair the primary goal of bankruptcy--requiring satisfaction of all claims against the bankrupt's estate proceed in a central forum; once the Board of Contract Appeals liquidated the claim, the government would look to the bankruptcy court for satisfaction. Second, government contracting law tends to be technical and esoteric. For example, the trial below took eight months and generated a 17,000 page transcript. The findings of fact constitute a moderate-sized book in themselves. Third, there are specialized fora designed specifically to resolve government contract disputes. Boards of Contract Appeals were created precisely because of the needs for expertise, speed, and uniformity in resolving government contract disputes. One cannot help but think that the ASBCA might have been better qualified by its experience and expertise to resolve the present case than was a bankruptcy judge who was at one stroke forced to master government contracting law. Fourth, government contract disputes may often have claims running against the government in addition to claims against the contractor. Resolution of the claims against the government is in the exclusive jurisdiction of the Court of Claims; thus, if a bankruptcy court did not defer to the Board of Contract Appeals, the same basic contract dispute might have to be tried twice.[6] Finally, though the Board of Contract Appeals were not specifically created by Congress, Congress certainly was aware of them and has endorsed them in the Wunderlich Act and the newly enacted Contract Disputes Act of 1978.
 
 
 52
 In summary, this does seem to be an area where a rule of decision would be proper. The various factors we have just discussed seem common to most, if not all, government contract disputes normally heard before Boards of Contract Appeals. This common nature is the key indicator for whether a rule or discretion by choice is appropriate; given these common factors, a rule for deferral is appropriate. We hold that a bankruptcy court should defer liquidation of a government contracting dispute to the Board of Contract Appeals.[7]
 
 CONCLUSION
 
 53
 A judge is more a philosopher than a scientist, a mechanic, or a builder. But the philosophy a judge expounds in his or her judicial expostulations has as its foundation the materials furnished by those more technical and empirical disciplines. De novo determinations of technical questions by judges are on the wane, and that is all for the good. That is not to say, however, that a judge should sit in cloistered chambers and make decisions far removed from the mechanical details giving rise to the issue at hand.
 
 
 54
 Accounting for the mechanical details, however, presents its own problems. No individual, no matter how robed, can be a renaissance person in this modern, complex society. And a judge therefore cannot be prepared to tackle the mundane and the celestial, the orbital and the suborbital, the oceanographic and the subterranean with the facility that might have been possible centuries ago. We are living in an age and era of specialization, with no end in sight, save perhaps a fiery holocaust where all knowledge and experience would be obliterated. The judicial philosophers have not been immune from this specialization, and the different cloisters may now house different orders with different vows and specialties.
 
 
 55
 These juridical turfdoms are not easily geodisized or surveyed for a metes and bounds description of their rights, powers, and duties. Bankruptcy and government contract dispute resolution are both institutions to be treated with great respect and deference. The life of judges would be easier if institutions such as these never came into conflict. When they do, we must mediate between them in the manner that least impairs their respective goals and purposes.
 
 
 56
 We read much today in the press and in the reported decisions and in the commentaries about the role of the bankruptcy judges in the jurisprudential cosmos in which we dwell. There are unanswered questions remaining, to be sure, but it can be said with some degree of certainty that a corporation or individual entering into the pale of bankruptcy does not relegate all other governmental agencies, regardless of their powers, strengths, and histories, to the back burner, without even permitting the stove to be lit. We searched the statutes and legislative history and can reach no absolute certitude, but in viewing the problems presented by this case it seems to us that it would be a misreading of our developing jurisprudence to believe that a bankruptcy court should be vested with nigh-unreviewable discretion to adjudicate highly esoteric and technical claims not subject to a purely jurisprudential solution.
 
 
 57
 Whether such discretion is to be exercised is a matter of law, almost pure law. The methodology of the exercise of discretion is brought to the judge, freighted and burdened by very high level principles of law. We are here dealing with a model form of deference because the forum to which the adjudication is initially assigned is technically equipped and experienced in the field to such an extent that it can make the job of a bankruptcy judge making ultimate determinations regarding the debtor easier, with greater harmony and symmetry within the existing body of government contracting law.
 
 
 58
 We would not dream of giving the Board of Contract Appeals the broad equitable jurisdiction given to the bankruptcy court, merely because the bankrupt was a party to a government contract. By similar logic, we see no reason to give to the bankruptcy court the determination of the existence of a claim and its valuation when that is within the peculiar expertise of the Board of Contract Appeals. This may be especially true when the sole significant asset of the debtor is a claim against the government, which must pass through the Board of Contract Appeals and Court of Claims. We need a narrow turf and a legal tightrope walker to determine the validity and magnitude of the contract claims, if any. Assuming there be such, we may then return to bankruptcy turf to see if reorganization is to be found in the grass.
 
 
 59
 Accordingly, we reverse the ruling of the bankruptcy court on the government's motion for stay, and remand this case to the bankruptcy court with instructions to stay further action on the claim of the United States pending proceedings in the Armed Services Board of Contract Appeals.
 
 
 60
 REVERSED AND REMANDED.
 
 
 
 [1]
 This proceeding arises under the Bankruptcy Act of 1898 as amended, rather than the Bankruptcy Reform Act of 1978, 11 U.S.C. Secs. 101-151326 (Supp.1979), so we are not affected by the unconstitutionality of the latter act. See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., --- U.S. ----, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)
 
 
 [2]
 Accordingly, we do not reach the government's other points of error
 
 
 [3]
 The Fifth Circuit has noted the position of the Court of Claims without endorsing or rejecting it. Hayes International Corp. v. McLucas, 509 F.2d 247, 261 n. 21 (5th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975)
 
 
 [4]
 There is an extensive body of literature dealing in detail with the subject of when a rule of decision is needed. See, e.g., Brock, Recent Work in Utilitarianism, 10 Am.Phil.Q. 241, 253-61 (1973). This overly simplistic statement is adequate for our purposes
 
 
 [5]
 It is the purpose of the Bankruptcy Act to convert the assets of the bankrupt into cash for distribution among creditors, and then to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start fresh free from the obligations and responsibilities consequent upon business misfortunes
 Williams v. United States Fidelity & Guaranty Co., 236 U.S. 549, 554-55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915).
 
 
 [6]
 This potential problem is illustrated quite nicely by this case. The bankruptcy court here affirmatively valued Gary's claim against the government, ostensibly to determine whether the government's claim against Gary was entitled to priority. Gary then attempted to use that "collateral" valuation of Gary's claim to support a claim for damages in the Court of Claims
 In that proceeding the government successfully argued that the claim against the government should be remanded to the ASBCA for administrative exhaustion. Gary Aircraft Corporation v. United States, No. 407-80C (Ct.Cl. Jan. 9, 1981). Before us the government argues that the bankruptcy court's findings were beyond its jurisdiction, relying on United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940), and United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940).
 We do not pass on the merits of this argument. We mention the issue now solely to point out that the considerable time and energy spent already on this jurisdictional question could all have been saved had the bankruptcy court deferred.
 
 
 [7]
 11 U.S.C. Sec. 93(d) (1976) provides that unliquidated claims "shall not be allowed if the court shall determine ... that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this title." Certainly the rule we announce today requiring liquidation in the Board of Contract Appeals cannot be used per se to support a finding of undue delay; the normal tests for delay would still apply. See, e.g., Schaefer v. Smith, 469 F.2d 1256, 1258 (10th Cir.1972) ("In an appropriate case a one year period could very possibly 'unduly delay the administration of the estate.' Under other circumstances, however, when considered with all other factors, a contingent claim should not be disallowed solely on the basis of administrative delay."). In this case, considering all factors, deferring to the ASBCA should not cause undue delay