**In re CONTINENTAL AIRLINES COR-PORATION, Continental Air Lines, Inc., Texas International Airlines, Inc., TXIA Holdings Corporation.**

Bankruptcy Nos. 83–04019–H2–5, 83–04020–H1–5, 83–04021–H3–5 and 83–04022–H3–5.

United States Bankruptcy Court, S.D. Texas.

June 27, 1986.

John J. Gallagher, David Callet, Charles Warren, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for Continental.

Jay D. Roth, Larry C. Drapkin, Taylor, Roth & Bush, Los Angeles, Cal., for Union of Flight Attendants.

Harvey R. Miller, Bruce R. Zirinsky, Weil, Gotshal & Manges, New York City, Myron M. Sheinfeld, Lenard M. Parkins, Sheinfeld, Maley & Kay, Houston, Tex., for Continental Air Lines and Texas Intern. Airlines.

Bruce Simon, Michael E. Abram, James L. Linsey, Cohen, Weiss & Simon, New York City, Helen Brattin, Schwartz, Waterman, Fickman & Van Os, Houston, Tex., for Air Line Pilots Assn.

Claude Montgomery, Booth, Marcus & Pierce, New York City, for Official Union Labor and Pension Creditors' Committee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO CLAIMS FOR FURLOUGH PAY FILED BY INDIVIDUAL PILOTS, FLIGHT ATTENDANTS AND THE UNION OF FLIGHT ATTENDANTS

T. GLOVER ROBERTS, Bankruptcy Judge.

### FINDINGS OF UNCONTESTED FACT

The following facts are either stipulated, uncontested or established by the evidentiary record in this case, of which the Court takes notice and is considered a proper and adequate basis on which to make these Findings and Conclusions:

1. On September 24, 1983, Continental Air Lines, Inc. and Texas International Airlines, Inc. filed petitions for reorganization under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101, *et seq.* Upon filing the bankruptcy petition, Continental temporarily suspended all domestic service and on September 27, 1983, Continental began rebuilding that service by reinstating a limited portion of its domestic service, initially requiring fewer employees than immediately prior to bankruptcy. The active employees worked under "emergency work rules" and were generally paid lower wages and benefits than they had received before the filing of the petition.

2. In response to Continental's implementation of the emergency work rules, the Air Line Pilots Association, International ("ALPA") and the Union of Flight Attendants ("UFA") called strikes which began October 1, 1983. The International Association of Machinists and Aerospace Workers ("IAM") had previously called a strike of all mechanics and related employees which began on August 13, 1983. The UFA and IAM strikes were terminated on April 17, 1985 when the unions instructed their members to offer unconditionally to return to work. The ALPA strike was terminated on October 31, 1985 pursuant to an Order and Award issued by this Court in accordance with procedures agreed to by ALPA and Continental.

3. Continental filed a Motion To Reject its collective bargaining agreements with ALPA and UFA on September 27, 1983. Following an extended hearing this Court approved Continental's motion to reject its collective bargaining agreements with ALPA (Order of June 19, 1984) and UFA (Order of December 5, 1984). Each contract rejection is retroactive to September 24, 1983.

4. This Court has previously found that "had Continental not made its unilateral changes in pilot pay and work rules, it would have been unable to continue its operations for very much longer for want of necessary cash and, because it could not compete effectively with the low cost carriers in direct competition with it, it would have continued losing money until it closed its doors." Findings of Fact And Conclusions of Law Relating To The Rejection Of The Collective Bargaining Agreement with ALPA ¶ 28; *see In re Continental Airlines Corp.*, 38 B.R. 67, 71–72 (Bankr.S.D. Tex.1984); Memorandum of Authorities

Authorizing Rejection Of ALPA Collective Bargaining Agreement at 12–13, 30. The Court also found that "without substantial concessions from [the UFA] contracts, Continental would run out of money and go out of business." Findings of Fact And Conclusions of Law Relating To The Rejection Of Collective Bargaining Agreements with UFA at 8.

5. This Court has also found that the emergency work rules applicable to pilots and flight attendants were modeled on work rules in use at Braniff Airways, Inc. and Southwest Air Lines, and that a substantial proportion of the unionized employees at Continental have indicated, by electing to cross the picket lines, "their willingness to work at the wage levels and under the working conditions (including increased productivity) offered by Continental." Memorandum Of Authorities Authorizing Rejection Of ALPA Collective Bargaining Agreements at 47–48; see Findings Of Fact And Conclusions Of Law Relating To The Rejection Of The Collective Bargaining Agreement With ALPA at ¶¶ 31, 32; Findings Of Fact And Conclusions Of Law Relating To The Rejection Of Collective Bargaining Agreements With UFA at 6–7, 10.

6. This Court has previously found that the striking pilots and flight attendants retained their status as employees during the time they were on strike. See Uncontested Facts And Conclusions Of Law Relative To Debtors' Motion For Summary Judgment With Respect To Contract Rejection Claims Of Strikers (Sept. 10, 1985). This Court specifically found that upon filing its petitions for reorganization, "Continental immediately went on a campaign to get the remaining pilots to agree to fly under the emergency work rules," and that once the October 1, 1983 strikes began, "Continental maintained a telephone 'bank' in which pilots were called and requested to fly." Memorandum Of Authorities Authorizing Rejection Of ALPA Collective Bargaining Agreements at 22. This Court has further found that Continental "made a strenuous effort to get striking pilots to return to service," and upon "instructions from its chief operating officer, Continental delayed hiring [replacement] pilots until it felt it had to do so to service its re-expanding route system." Id. at 22–23.

7. Although certain management, clerical and maintenance employees were furloughed on September 24, pilots and flight attendants were not furloughed. The pilots and flight attendants were so advised by letters dated September 24, 1983. Those letters expressly stated that furloughs would apply only to management, clerical and maintenance employees. In addition, John Adams, Vice President of Personnel, notified the chairman of ALPA's negotiating committee that pilots were not on furlough status but were considered active employees. There is no evidence that Continental informed pilots or flight attendants that they were being furloughed, or treated them as furloughed employees. No pilot or flight attendant received notice of furlough.

8. Beginning on September 24, Continental officials began calling pilots to ask whether they would be available to work under the Emergency Work Rules when operations resumed on September 27, 1983. The unavailability of pilots curtailed Continental's ability to resume and expand its operations following the 3–day shut-down. Memo.Op. at 22–23.

9. The furlough provisions of the ALPA collective bargaining agreement ("Red Book") required Continental to give pilots to be furloughed thirty days notice of furlough. (Sec. 23–3, A.) Affected pilots were to be allowed to bid on a system-wide basis and displace more junior pilots. (Sec. 23–2, D.) The amount of furlough pay was to be based on the pilot's years of service and was payable in a lump sum, regardless of the length of the furlough. Pilots were eligible to receive between one-half month and five months of salary as furlough pay. (Sec. 23–6, A–C.) This Court has already held that compliance with these ALPA Red Book provisions would have been "physically impossible" if the temporary shut-down of domestic operations were viewed as a

"furlough". *See* Findings of Fact, ¶ 27 (Aug. 17, 1984).

10. The ALPA Red Book expressly exempts the Company from any obligation to provide either notice of furlough or furlough pay where the reduction in force "[is] occasioned by a strike, work stoppage, act of God or circumstances over which the Company had no control."

11. Under the furlough provisions of the UFA collective bargaining agreement ("Black Book"), Continental was required to give furloughed flight attendants fifteen days notice of a furlough. Flight attendants who would be potentially affected by a reduction in force were to be allowed to bid on a system-wide basis and displace more junior flight attendants. Attendants were eligible to receive two weeks of salary as furlough pay.

12. Under the furlough provisions of the TXI–AFA collective bargaining agreement ("Brown Book"), TXI was required to give furloughed flight attendants fifteen days notice or two weeks pay, with similar bidding procedures.

13. Both the Black Book and the Brown Book provided for exceptions to the furlough pay provisions, however, requiring no notice when a reduction in force is caused by a "strike, work stoppage or act of God" (Black Book § 18 S) or "strike, work stoppage, act of God, or circumstances reasonably beyond the control of the Company" (Brown Book § 12 D).

14. This Court has previously held that Continental's management made exhaustive attempts, prior to September 24, 1983, to renegotiate its collective bargaining agreements with ALPA and UFA to permit the Company to survive as a going concern. The temporary shut-down and restructuring of operations that occurred on September 24, 1983 was a desperate last-ditch effort to save the Company, and did not take place until *after* the unions had denied Continental the necessary relief. *See* Memorandum of Authorities Authorizing Rejection of ALPA Collective Bargaining Agreement at 12–13.

15. Despite Continental's efforts to find a way to survive economically prior to the bankruptcy, Continental was unable to do so and filed for bankruptcy to restructure its operations because of its dire financial condition and the refusal of ALPA, UFA and other unions to agree to concessions. *In re Continental Airlines Corp.,* 38 B.R. 67, 70 (Bankr.S.D.Tex.1984).

16. Individual pilots and flight attendants, as well as the Union of Flight Attendants on behalf of its members, have filed claims for furlough pay alleged to be due as a result of the events of September 24, 1983.

## CONCLUSIONS OF LAW

1. The claimants challenge the jurisdiction of this Court through their contention that any dispute concerning Continental's liability for furlough pay under the contract rejected by this Court must, under the Railway Labor Act, be submitted to arbitration. This contention has no merit because Bankruptcy Courts have jurisdiction to decide all claims against any estate. 28 U.S.C. §§ 1334(a); 157(a), (b)(1), (b)(2)(B).

2. Bankruptcy judges also have discretion to resolve the claims even if another tribunal exists for such disputes. Indeed, in the absence of bankruptcy, *all* claims would have been adjudicated in another forum. *Zimmerman v. Continental Air Lines, Inc.,* 712 F.2d 55, 56 (3d Cir. 1983), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984). Relying on the policies underlying the 1978 Bankruptcy Reform Act, the Third Circuit held that the Act impliedly modified the express provisions of the Arbitration Act. 712 F.2d at 56, 59.

> Bankruptcy proceedings, however, have long held a special place in the federal judicial system. Because of their importance to the smooth functioning of the nation's commercial activities, they are one of the few areas where Congress has expressly preempted state court jurisdiction. *See* 28 U.S.C. § 1334. While the sanctity of arbitration is a fundamental

federal concern, it cannot be said to occupy a position of similar importance. *Therefore, because of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the Arbitration Act.* Thus while a bankruptcy court would have the power to stay proceedings pending arbitration, the use of this power is left to the sound discretion of the Bankruptcy Court.

712 F.2d at 59–60 (emphasis added).

3. Citing *Gary Aircraft Corp. v. United States (In re Gary Aircraft Corp.)*, 698 F.2d 775 (5th Cir.1983), *cert. denied*, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983), the unions argue that Bankruptcy Courts lack jurisdiction to disallow claims in disputes that Congress has committed to a specialized tribunal. The unions' reliance on *Gary Aircraft* is misplaced, for reasons the Court has already set out at length elsewhere. *See, e.g.*, Findings of Fact and Conclusions of Law With Respect To The Union Of Flight Attendants' Claims For Contract Rejection Damages at 8–12.

■ 4. Even if this Court did not have jurisdiction to liquidate the furlough pay claims, it nevertheless has jurisdiction to estimate the value of furlough pay claims. Indeed, 11 U.S.C. § 502(c) requires the bankruptcy court to estimate the value of unliquidated claims where liquidation would unduly delay reorganization. *See* Order Granting Debtors' Motion to Estimate All Contingent Unliquidated Employee Claims For Purposes Of Chapter 11 Plan, *In re Continental Airlines, Corp.*, 57 B.R. 842 (Bankr.S.D.Tex.1985). Liquidation of these furlough claims through arbitration would unduly delay Debtors' reorganization. Furthermore, it has been held that courts may estimate the value of claims asserted on behalf of employees by the National Labor Relations Board ("NLRB"), without deferring to any NLRB administrative process which might otherwise apply. *See In re Unit Parts Co.*, 9 B.R. 386 (W.D.Okl.1981).

■ 5. Provisions for the payment of severance of furlough benefits to pilots and flight attendants may constitute a welfare benefit plan subject to the requirements and procedures of the Employee Retirement Income Security Act. The Debtors cite, as support for this point, *Gilbert v. Burlington Industries, Inc.*, 765 F.2d 320, 325–26 (2d Cir.1985); *Anderson v. Ciba-Geigy Corp.*, 759 F.2d 1518 (11th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 410, 88 L.Ed.2d 360 (1985); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985). Because those provisions were included in collective bargaining agreements which contained procedures for the resolution of disagreements over the interpretation of their provisions, in the absence of bankruptcy the furlough pay claims would possibly be resolved according to those procedures. In support of their position, the Debtors cite *Air Line Pilots Association v. Northwest Airlines, Inc.*, 627 F.2d 272 (D.C.Cir.1980) (ERISA does not invalidate Railway Labor Act's mandatory arbitration requirements); *Bonin v. American Airlines, Inc.*, 621 F.2d 635 (5th Cir.1980) (same). However, for the reasons stated above, this Court is not required to defer to those procedures, nor in the circumstances presented here, should it do so.

■ 6. Neither pilots nor flight attendants were furloughed on September 24, 1983, as that term is used in the respective prepetition collective bargaining agreements. Indeed, pilots and flight attendants were expressly put on notice by the Company's September 24 letter that they were on active status following the bankruptcy. Nor were the pilots or flight attendants "constructively" furloughed by virtue of the temporary shutdown in operations. The Continental-ALPA collective bargaining agreement expressly provides for brief cancellations of scheduled flights, such as occurred during the three-day shut-down. Section 25–20 J of the Red Book provides that pilots who lose flying time because of such flight cancellations may obtain addi-

tional trips, but will not receive compensation for the missed flights, except in a limited number of situations. The fact that the collective bargaining agreement included a contract provision, distinct from the furlough pay section, which expressly recognized and provided for the short-term cancellation of flights demonstrates in the opinion of this Court, that the furlough pay provision was *not* intended to cover the three-day cessation of operations which occurred on September 24.

■ 7.   Considered in their entirety, the Court concludes that the ALPA and UFA collective bargaining agreements contemplate a partial, rather than a total, reduction in force at specific bases in order to give rise to furlough pay liability. This conclusion flows from the elaborate and comprehensive scheme to handle partial layoffs in which only a segment of the workforce is removed from active status. The contract furlough scheme would be impossible to administer in the case of a total cessation of Company operations. The contract requires posting and the movement of personnel in a daisy-chain fashion through a system-wide bidding process to fill vacancies resulting from displacements and furloughs. Plainly, the complex and unwieldy systems of personnel movement, in the Court's view, could not have been intended to have any application to a total shut-down of the airline.

■ 8.   That pilots and flight attendants were not furloughed on September 24, 1983 is further demonstrated by the reasons for Continental's three-day shut-down. The temporary cessation of operations was precipitated by the Company's financial crisis which led to the bankruptcy filing. The three-day hiatus was required to restructure the airline's operation. The purpose of "furlough" or "severance" pay is to provide an employee who has lost his or her job some "breathing room" to find another job, possibly after retraining. Here no pilot or flight attendant lost his or her job; rather, work was unavailable for only three days, after which the Company began a rebuilding process which the striking pilots and flight attendants themselves interrupted by virtue of their strikes on October 1. Continental management personnel began calling pilots shortly after the bankruptcy filing on September 24 to determine if they were available to work under the Emergency Work Rules when operations resumed on September 27, 1983, and both pilots and flight attendants voluntarily withheld their services beginning on October 1, 1983. The Court rejects the contention of certain individual pilot claimants that because as late as January 1984 only 50% of the pre-bankruptcy pilot workforce had returned to work, the September 24, 1983 shutdown was not temporary. It is undisputed that the pilots went on strike on October 1, 1983 and that the strike continued until October 31, 1985. The percentage of the pilot workforce at work in January 1984 is attributable to the strike, and not to Continental. *See* Finding of Fact ¶ 6, *supra*. Under these circumstances this Court finds that no furlough took place.

9.   To interpret the furlough pay provisions to apply to a short-term cancellation of flight operations would lead to absurd results. Under the furlough pay provisions, pilots are entitled to a lump sum payment of up to five months' pay, and flight attendants are entitled to up to four weeks' pay, depending upon length of service. These payments are due regardless of the length of the furlough. To allow furlough pay in the circumstances presented here, would result in the pilots and flight attendants receiving up to five months' pay for a mere three-day suspension of work, virtually guaranteeing a windfall for the entire pilot and flight attendant workforce. These employees were in no meaningful sense furloughees at all, and allowance of their claims for furlough pay would defeat one of the purposes of the bankruptcy proceeding itself, which is to preserve the assets of the company.

10.   The unions rely heavily on the arbitration award in *New York Airways, Inc. & Association of Flight Attendants*, NYA Case No. 2–76 (Jan. 18, 1977) (Van Wart,

Arb.), to support their argument that furlough pay is applicable to short-term suspensions of service. This Court finds, however, that major differences exist between the collective bargaining agreements at issue in that arbitration and the union contracts here. In addition, as noted by the arbitrator in *New York Airways,* the employer was liable for giving ambiguous and inadequate notice of furlough; Continental, on the other hand, gave clear and precise notice to its pilots and flight attendants that they were on active status.

■ 11. Finally, the unions argue in their oppositions that since Continental's international flights continued after September 24, Continental's operation was not *completely* shut-down and, accordingly, the furlough pay provisions were applicable. However, Continental's ongoing international flights constituted only a small fraction of its total operation. In fact, the temporary shut-down was so massive that this Court found that compliance with the complex system of preferencing provided in the furlough provisions would have been "physically impossible." Memorandum of Authorities Authorizing Rejection Of Airline Pilots Association collective Bargaining Agreement at 8 and at Finding 27 (Aug. 17, 1984). The three-day shut-down of domestic operations did not become a "furlough" merely because the international operations continued.

■ 12. This Court has held that Continental had "no viable alternative" to filing for bankruptcy and temporarily shutting down its operations. *In re Continental Airlines Corp.,* 38 B.R. 67, 70 (Bankr.S. D.Tex.1984). It is well settled that a nonparty to a proceeding may be bound by a decision if one of the parties to the proceeding is so clearly aligned with the non-party's interest as to be its "virtual representative." *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,* 723 F.2d 1566 (Fed.Cir. 1983); *United States v. Geophysical Corp.,* 732 F.2d 693 (9th Cir.1984). Absent a showing that a union's interests are antagonistic to those of its members, a union as a litigant is considered the representa-

tive of the interests of its members. *Bolden v. Pennsylvania State Police,* 578 F.2d 912, 918–19 (3d Cir.1978); *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Acme Precision, Inc.,* 515 F.Supp. 537 (E.D.Mich.1981). Accordingly, union members are estopped from attacking the judgment and other court determinations made in suits where the union has been a party. *Bolden v. Pennsylvania State Police, supra; U.A.W. v. Acme Precision, supra.*

■ 13. The Court further rejects the suggestion by UFA that because the Emergency Work Rules were "detailed" and preparations for the Chapter 11 filing were "extensive," the shut-down must have been planned in advance, some how suggesting a subterfuge. This Court specifically rejected the claim that the bankruptcy filing was a planned subterfuge after exhaustive evidentiary hearings on the unions' motion to dismiss the bankruptcy petitions and on the Debtors' motion to reject the collective bargaining agreements. *See In re Continental Airlines Corp.,* 38 B.R. 67, 71–72 (Bankr.S.D.Tex.1984).

■ 14. The Court has found earlier that the IAM strike was a contributing cause of the bankruptcy filing and temporary cessation of operations. *See* Findings of Fact and Conclusions of Law On The Debtors' Motion To Reject Collective Bargaining Agreements Relating to Mechanics And Related Employees at ¶¶ 39, 41, 48 (Nov. 30, 1984). The strikes by ALPA and UFA on October 1, 1983 further restricted Continental's ability to provide work even to the non-striking pilots and flight attendants. The furlough pay provisions of the collective bargaining agreements apply equally to the temporary unavailability of work caused by strikes, such as the three union strikes against the Debtors. This Court concludes, furthermore, that no pay is due to one employee group idled by the strike of another, when management decides to cut costs in the face of such an economic emergency. *Pan American*

**890**

*World Airways, Inc.,* 36 Lab.Arb. (BNA) 1232 (1961) (Wolff, Arb.).

15. This Court concludes that the routine furloughs provided for in the ALPA and UFA collective bargaining agreements are vitally different from the brief, but practically company-wide shut-down of operations that occurred on September 24, 1983. Consequently, this Court finds that the events of September 24, 1983 did not give rise to furlough pay liability to pilots or flight attendants.

■ 16. No affidavits or other admissible evidence have been offered to establish that there is a genuine dispute as to any material fact concerning the furlough pay claims subject to Debtors' motion. The three affidavits submitted by individual pilot claimants are insufficient to create genuine disputes of material fact because they are based on hearsay from an unidentified declarant, *see Miller v. Solem,* 728 F.2d 1020, 1026 (8th Cir.1984); *Northern Oil Co. v. Socony Mobil Oil Co.,* 347 F.2d 81, 84–85 (2d Cir.1965); are based on assumptions rather than fact, *see Alger v. United States,* 252 F.2d 519, 521 (5th Cir.1958); or fall short of establishing sufficient facts to create a dispute. Because this Court is persuaded that Debtors are entitled to judgment as a matter of law, summary judgment is appropriate and will be granted with respect to the furlough pay claims filed by individual pilots and flight attendants and to furlough pay claims filed by UFA on behalf of flight attendants.

17. For the foregoing reasons, the claims for furlough pay filed by UFA and individual pilots and flight attendants will be disallowed. This Court further rules that the value of all furlough pay claims filed by pilots, flight attendants and UFA are estimated pursuant to 11 U.S.C. § 502(c) to be zero, based on the Court's conclusion that the claims are ultimately without merit.

These Findings of Fact and Conclusions of Law are hereby incorporated in and made a part of the Order attached hereto.