IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

--------------
No. 89-2943
--------------

IN THE MATTER OF:  CONTINENTAL AIRLINES, et al.,

                                        Debtors.

JOSEPH E. O'NEILL, et al. and
JAMES STEPHENS, et al.

                                        Appellants,
                        versus

CONTINENTAL AIRLINES, INC.,

                                        Appellee.

                ***************

----------------------------------------------------------------
        Appeals from the United States District Court
              for the Southern District of Texas
----------------------------------------------------------------
                  (January 19, 1993)

Before POLITZ, Chief Judge, BROWN and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

    This case arises, like so many others before it, out of the
bankruptcy proceedings of Continental Airlines, Inc. (Continental).
However, unlike many of those other cases, we reach the merits of
this case over two years after the parties argued the case before
this court.  These two groups of pilots brought their individual
furlough pay claims after Continental Airlines filed petitions
under Chapter 11 of the United States Bankruptcy Code on September
24, 1983 in the United States Bankruptcy Court for the Southern
District of Texas.  On June 27, 1986, Bankruptcy Judge T. Glover
Roberts signed an order granting Continental's motion for summary

1

judgment, disallowing the pilots' furlough pay claims and estimating the claims at zero. On August 4, 1989, the district court affirmed, and the pilots appealed. In the meantime, Continental filed a second Chapter 11 bankruptcy petition on December 3, 1990 in the United States Bankruptcy Court for the District of Delaware, which stayed all judicial actions against the airline pursuant to 11 U.S.C. § 362(a). We issued an opinion on March 15, 1991 holding that the pilots' appeal was stayed in light of the 1990 bankruptcy proceedings. Matter of Continental Airlines, 928 F.2d 127 (5th Cir. 1991). On August 4, 1992, the Delaware bankruptcy court issued an order granting the parties' joint motion for limited relief from the stay, in order that we might render our decision in this case.[1]

The pilots appeal 1) the district court's holding that a furlough had not occurred on September 24-27, 1983, 2) the district court's holding that a post-filing rejection of the collective bargaining agreement relieved Continental of furlough pay obligations, 3) the district court's estimation of the furlough pay

---

[1] The United States Bankruptcy Court for the District of Delaware, Judge Helen S. Balick, entered the following order: "It is hereby ordered this 4th day of August, 1992, that the Joint Motion of Continental Airlines, Inc. and O'Neill Group For Limited Relief From Stay is granted." O'Neill v. Continental Airlines, No. 90-932 (Bankr. D. Del. Aug. 4, 1992).

In their Joint Motion for Limited Relief from Automatic Stay, the parties requested only that the bankruptcy court lift the stay to permit this court to render its decision in the pending appeal. The parties emphasized that the limited stay relief would allow no further action by the parties, and that the parties would remain under the control and guidance of the bankruptcy court regardless of this court's decision.

2

claims at zero, and 4) the district court's refusal to require recusal of the bankruptcy judge and to vacate the bankruptcy judge's decision. We hold that on the construction of the collective bargaining agreement between the parties, a furlough of the pilots occurred on September 24-27, 1983, and therefore, we reverse the bankruptcy court's order granting summary judgment in favor of Continental. Because no genuine issues of material fact exist and the pilots are entitled to judgment as a matter of law, this is one of those rare cases in which granting summary judgment in favor of Continental was improper, and we grant summary judgment in favor of the pilots. Additionally, we hold that Continental's rejection, with the approval of the bankruptcy court, of the collective bargaining agreement between the parties did not serve to relieve Continental of its obligations under the agreement. Finally, we hold that Judge Roberts' failure to stand recused constituted a violation of 28 U.S.C. § 455(a), and we therefore remand the portion of the bankruptcy court's order estimating the pilots claims at zero value to the bankruptcy court for calculation of the pilots' claims by a new bankruptcy judge.

*The Facts*

On September 24, 1983, the president of Continental Airlines sent a memorandum to all employees announcing that the company would be seeking protection from creditors under the Chapter 11 reorganization provisions of the United States Bankruptcy Code. See 11 U.S.C. §§ 1101-1174. The memorandum stated that Continental would be reducing the size of its operations and would therefore be

required to furlough many of the company's employees.[2] The furloughs became effective one and one half hours later, at 5:00 p.m., when Continental filed its Chapter 11 petition. Continental suspended all domestic passenger service and a portion of its international service until September 27, 1983, when the company resumed a limited portion of its domestic operations using substantially fewer pilots than it had employed before filing for bankruptcy. On October 1, 1983, the ALPA commenced a strike against Continental.

A number of Continental pilots filed individual claims for furlough pay pursuant to the collective bargaining agreement between Continental and ALPA, commonly referred to as the "Red Book." The pilots claimed that they were entitled to furlough allowances totalling $32.6 million as a result of the three-day

---

[2] The memorandum stated as follows:

Because of the contemplated initial reduction in the size of our operations, we will be required to furlough many of our employees prior to our filing for reorganization. Such furloughs will be made without prejudice to our rights as a debtor-in-possession. These furloughs are effective as of 5:00 p.m. (C.D.T.) September 24, 1983. The furloughs apply to (1) management, clerical and maintenance employees (unless specifically notified that they are being retained), and (2) all personnel at stations and reservations offices to be closed indefinitely. Pilots, flight attendants, agents, clerical and reservations personnel located or based at the "open cities" (as shown on Attachment A) will be subject to emergency work rules established by the Company to provide for the wages, hours and working conditions for these employees. These emergency work rules have been sent to all "open cities" for posting and distribution.

Record, Vol. 3 at 362-63.

4

shutdown.  The Stephens Group and the O'Neill group together represent 482 of the 1069 pilots who filed claims.  The two groups claim that they collectively are entitled to $1.5 million in furlough pay.

Continental moved for summary judgment disallowing the furlough claims and estimating the claims at zero value.  The two groups of pilots filed oppositions to which Continental replied.  The bankruptcy court granted Continental's motion for summary judgment and estimated the pilots' claims at zero.  The district court affirmed the bankruptcy court's order on August 4, 1989.  The pilots appeal.

*On Furlough*

The memorandum sent to all employees on September 24, 1983 stated that the required employee furloughs would apply to specific personnel, including "1) management, clerical and maintenance employees . . . and 2) all personnel at stations and reservations offices to be closed indefinitely."  The memorandum went on to state that "[p]ilots, flight attendants, agents, clerical and reservations personnel located or based at the 'open cities' [would] be subject to emergency work rules established by the Company . . ."

Continental, relying in part on the language of the September 24 memorandum, argues that the pilots were not put on furlough during the three-day shutdown.  Continental contends that other employees were furloughed, but that the pilots were subject to emergency work rules, which was evidenced by the fact that when

5

Continental resumed reduced domestic operations on September 27, Continental officials began calling pilots on the phone to ask them to return to work.

The pilots claim that despite the language in the September 24 memorandum, Continental's three-day suspension of service constituted a furlough for which they are entitled to furlough allowance under the terms of the Red Book. Section 23 of the Red Book covers pilot furloughs. Part 3 contains furlough rules and Part 4 provides for furlough pay according to the pilot's period of time in active service. The Red Book, however, does not define "furlough."

Both the pilots and Continental argue that whether the pilots were placed on furlough on September 24, 1983 is a matter of contract interpretation. The pilots argue that they were placed on furlough as that term was contemplated in drafting the furlough provisions of the Red Book. Continental argues that the furlough provisions of Section 23 are not self-effectuating, pointing to other provisions in the Red Book which Continental argues belie the pilots' claim that the furlough provisions of the Red Book are applicable to the three-day shutdown. Continental contends that Section 4 of the Red Book, containing a minimum flight pay guarantee for pilots, Section 25, detailing flight rescheduling, and Section 3, Part 6, regarding trip cancellation, are the provisions applicable to the three-day shutdown.

The bankruptcy court found that the pilots were not furloughed on September 24 as that term is used in the Red Book. In Re

6

Continental Airlines Corp., 64 B.R. 882, 887 (Bankr. S.D. Tex. 1986). The court pointed to the specific clauses in the collective bargaining agreement providing for short-term cancellation of flights. The court also stated that the agreement contemplates a partial reduction in force at specific bases triggering the furlough provisions, not a total shutdown. The court examined the reasons behind the three-day shutdown, and concluded that application of the furlough provisions in this case would lead to an absurd result.

The district court affirmed the bankruptcy court's finding that no furlough had taken place. The court stated that nothing in the September 24 memorandum indicated that Continental intended to furlough the pilots. The court also found that certain sections of the Red Book expressly contemplated temporary cancellation of flights. In response to the pilots' argument that the shutdown was not temporary, the court pointed to Continental's actions in telephoning the pilots and requesting them to come back to work as indicating that Continental attempted to do everything possible to build back its operations. The district court asserted that it was the pilots' strike that prevented Continental from expanding its services after the three-day shutdown. Because the court concluded that the flight cancellations were temporary, the court held that Section 3, Part 6 and Section 25, Part 2 of the Red Book applied. The court stated that these provisions provided a separate contractual means of dealing with temporary cancellation of flights, belying the pilots' contention that the three-day

cancellation constituted a furlough. The court concluded that requiring Continental to pay the furlough allowance would result in a windfall for the pilots.

The fact remains that as of 5:00 p.m. on September 24, 1983, all of Continental's domestic operations were completely shut down, with only a limited number of international routes continuing to operate. As of 5:00 p.m. on September 24, there was *no work* for Continental's union or nonunion employees involved in the company's domestic operations, including the pilots. There was no work for three days, until September 27 when Continental resumed operations utilizing a greatly reduced number of employees. Whether the three-day period during which Continental made no work available constituted a furlough of the pilots must be determined by an examination of the facts and the terms contained in the Red Book, which is the official agreement entered into between the parties, not by reference to an informational memorandum sent to all employees that simply announced a work stoppage.

We review *de novo* the district court's construction of the collective bargaining agreement between the parties, or Red Book, which is a question of law. Sheet Metal Workers, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1279 (3d Cir. 1991); Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp., 920 F.2d 1491, 1493 (9th Cir. 1990), cert. denied, ___ U.S. ___, 111 S. Ct. 2855, 115 L. Ed. 2d 1023 (1991); DeMarco v. C&L Masonry, Inc., 891 F.2d 1236, 1238-39 (6th Cir. 1989). We hold that the district court erred in finding that no furlough of the pilots occurred. Based on the

8

construction of the Red Book, we hold that the three-day period during which the pilots had no work constituted a furlough of the pilots.

Continental relies on certain sections of the Red Book to give meaning to the term "furlough" -- to define what furlough is not. In oral argument, Continental likened the domestic operations shutdown to "a snowstorm in Denver", and the company argues that the mere presence of provisions covering flight cancellations due to bad weather, holidays, schedule changes or for other reasons indicates that the three-day shutdown was not a furlough within the meaning of the Red Book. We find that the provisions of the Red Book cited by Continental regarding flight cancellations fail to lend meaning to the term "furlough" as that term is used in Section 23 of the Red Book.

### a. Section 3, Part 6 and Section 25, Part 2: Trip Cancellation

Continental first cites Section 3, Part 6 of the Red Book. Part 6 is entitled "Pay for Equipment Substitutions and/or Trip Cancellations", and covers trip cancellations due to holidays, schedule changes, accommodation of extra sections or charters, or weather or mechanical reasons.[3] The company then cites Section 25,

---

[3]     Section 3, Part 6 provides in pertinent part:

**Part 6 - Pay for Equipment Substitutions and/or Trip Cancellations**

\* \* \*

B.     Domestic and Flag:  When a pilot is awarded a regular line of time and trips are subsequently cancelled from that line due to:

Part 2, Paragraph J, which covers instances "when a regular pilot loses flying time from his trip pattern because of . . . cancellation, except as provided for in Section 3, Part 6, Paragraph B . . .", and Paragraph K, which provides a remedy for a pilot "when [he] has commenced a trip series and loses a portion of that series through no fault of his own . . ."[4]  Significantly, the

            (1)   holiday cancellations subsequent to bid
                  award, or

            (2)   schedule changes subsequent to bid award, or

            (3)   accommodation of extra sections or charters,
                  or

            (4)   weather or mechanical reasons during the
                  final seventy-two (72) hours of a calendar
                  month,

        such pilot shall be paid for the scheduled time
        for the trip(s) so cancelled, less any time for
        which he is reassigned.  A pilot may only be
        reassigned on the same calendar days he was
        originally scheduled to fly.

[4]      Section 25, Part 2 provides in pertinent part:

    **Part 2 - Operation of Regular Trip Bid Patterns**

                            * * *

        G.    Policy Regarding Trip Pickup

              (1)   When a regular pilot's projected schedule for
                    a month is less than seventy-six (76) hours,
                    he may pick up a trip out of open time
                    providing the reserve pilot scheduled to fly
                    the trip can be given at least five (5) hours
                    notice prior to scheduled departure. . .

                            * * *

        J.    When a regular pilot loses flying time from his
              trip bid pattern because of:

              (1)   cancellation; except as provided for in

remedies provided for pilots in the circumstances described in both Paragraph J and Paragraph K involve picking up other flights from "open time."

Continental argues that both of these provisions together show that the Red Book "plainly did not contemplate that a temporary cancellation of flights would constitute a furlough." These provisions plainly do not indicate anything of the kind. Section 3, Part 6 and Section 25, Part 2 provide for situations in which flights have been cancelled for a specific reason and provide a specific remedy when flights are running otherwise as normal. As for the general language in Section 25, Part 2, Paragraph J(1) regarding cancellations other than those provided for in Section 3,

> Section 3 (Compensation), Part 6, Paragraph B,
>
> (2) weather or mechanical irregularities,
>
> (3) flight time limitation,
>
> (4) emergencies in his immediate family, or
>
> (5) trips dropped during time of transfer from one base to another, he may exercise the provisions of Part 2, G. of this Section.
>
> NOTE: (1) and (2) above do not pertain to pilots who lose time due to Company convenience. They are covered under the rescheduling provisions in Part 6 of this Section.
>
> K. When a regular pilot has commenced a trip series and loses a portion of that series through no fault of his own, he shall have the option of picking up any portion of the balance of the series that he can reasonably pick up, or he may pick up time from <u>open time</u>. . . . This paragraph does not apply to a pilot who loses time due to Company convenience as covered in Part 6 of this Section.

11

Part 6, the three-day shutdown hardly can be encompassed by the situation in Paragraph J(1), the remedy for which was not only unavailable, but meaningless during a three-day period when all of Continental's domestic operations had ceased.

Furthermore, the application of Section 23 of the Red Book to the three-day shutdown of operations does not turn on whether the shutdown was temporary or permanent. Merely because the shutdown lasted only three days does not invoke automatic application of the sections of the Red Book regarding temporary cancellations. It is the nature of the cancellation, not its duration alone, that determines whether specific provisions of the Red Book apply. Neither does the temporary nature of the shutdown indicate that the provisions cited above present an alternative to the furlough pay provisions in Section 23. If a temporary shutdown presented Continental with a choice as to whether to use the temporary cancellation provisions (although, as stated above, these provisions provide no remedy in the case of a total shutdown) or the furlough allowance provisions of Section 23, effectively there would be no choice; classifying the three-day shutdown as a temporary cancellation would preclude furlough payments to the pilots.

Because we hold that the application of the Section 23 furlough provisions does not turn on the temporary nature of the shutdown, we need not address the pilots' arguments regarding the long-term impact of the shutdown on their jobs or Continental's assertions that the availability of work after the shutdown was

12

prevented only by the pilots' strike. Whether employment was available after the shutdown, albeit on different terms, is irrelevant; the fact remains that *no work* was available for three days, and the three-day shutdown constituted a furlough.

### b. *Section 4: Minimum Pay Guarantee*

Continental also points to the minimum flight pay guarantee contained in Section 4 of the Red Book in its effort to persuade this court that the three-day shutdown was not a furlough. Section 4 provides that "each regular pilot shall receive a minimum monthly guarantee consisting of 86% of the monthly maximum."[5] Unlike the sections of the Red Book regarding temporary cancellations of flights, the minimum pay guarantee does not hinge upon the availability of regularly scheduled flights, and Section 4 does not expressly contemplate a normal operating situation. The section merely guarantees pilots a minimum amount of pay per month. The Section 4 guarantee does not indicate, however, that the minimum pay guarantee is an alternative to the furlough provisions of

---

[5]     Section 4 provides in pertinent part:

**Part 1 – Minimum Flight Pay Guarantee**

A.    Domestic

(1)   Regular Guarantee

(a)   Each regular pilot shall receive a minimum monthly guarantee consisting of <u>86.6% of the monthly maximum</u> to include longevity, hourly, mileage and gross weight pay, at rates applicable to his status, one-half day and one-half night on the equipment he is currently flying on a regular trip bid pattern. . . .

13

Section 23 as urged by Continental.  Following the same reasoning set forth above regarding the temporary cancellation provisions, a choice between the furlough provisions and the minimum pay guarantee in the event of a temporary, total shutdown would render the furlough provisions of Section 23 a nullity.

### c.    Section 23:  Furlough

Section 23 of the Red Book is entitled "Reduction in Force, Furlough and Recall."  Part 1 covers reductions in force, Part 2 deals with closings of pilot bases, Part 3 contains furlough rules and Part 4 sets out a furlough pay schedule.[6]  The only argument

---

[6]    Section 23 states in pertinent part:

**Part 1 - Reduction in Force**

D.    All pilots that could be affected by a reduction in force should submit a new standing bid indicating the lowest relative seniority position acceptable to them at each base/sub-base on the following basis, and all vacancies shall be filled on the basis of this new standing bid, or, in its absence, the last standing bid the pilot has submitted.

* * *

(2)  Affected pilots (as defined in Section 2) may displace any pilot junior to them at any base/sub-base in any status.

* * *

**Part 3 - Furlough Rules**

A.    All orders to pilots involving furloughs or recall from furloughs shall be in writing.  Thirty (30) days notice is required prior to furlough.  Upon recall, a pilot will be allowed thirty (30) days to return to service.  Any furloughed pilot who fails to notify the Company within ten (10) days of his intention to return to duty, and who fails to return to duty within thirty (30) days after

14

notice has been sent by certified mail, return receipt requested, to the last address furnished the Company, will be considered out of service unless a justifiable reason be presented. For the purpose of this Paragraph, "notice" means attempted delivery by the U.S. Postal Service of a letter sent Certified Mail, marked "Deliver to Addressee Only."

(1) Should the Company offer recall to a pilot which would require him to be based in Guam, he may refuse that recall and remain on furlough as long as there is a junior pilot on the recall list. If the most junior pilot refuses recall, he will lose all of his seniority.

(2) When a pilot is on furlough he shall, upon request, prior to ten (10) days following notice of recall, be granted a leave of absence of up to three (3) years from the date of such request provided a pilot(s) junior to him is on furlough.

B.  All pilots furloughed from the Company shall file their current permanent address with the Vice President-Flight Operations at the time of furlough. Any subsequent change of address should be supplied to the Vice President-Flight Operations.

C.  Pilots furloughed due to a reduction in force shall be allowed, for seniority purposes, all time accrued prior to such furlough and shall continue to accrue seniority during the period of furlough. All such furloughs shall expire at the end of ten (10) years from the effective date of such furlough, or at the expiration of a period equal to the furlough pilot's length of service with the Company, whichever is longer.

D.  When a pilot is furloughed or his employment with the Company is terminated during any year, he shall be paid for vacation time earned and not previously taken, and the total amount of such vacation compensation shall be at the rate of pay currently receivable by such pilot and such amount shall be in addition to any other compensation due him as of the date of termination of his employment.

15

E.  Pilots recalled from furlough shall be entitled to exercise their respective seniority as regards bidding rights on base/sub-base vacancies which necessitated the recalls.  Such pilots, when called from furlough, shall be recalled to the base from which furloughed, or a Company paid move shall be granted in accordance with Section 6 (Moving Expenses).

F.  Any pilot recalled from furlough shall be guaranteed a minimum of ninety (90) days employment or ninety (90) days pay and credit in lieu thereof.

G.  The notice provisions under Part 3 and furlough pay under Part 4 shall not apply if the furlough is occasioned by a strike, work stoppage, act of God or circumstances over which the Company has no control.

H.  If a pilot is furloughed within twelve (12) months of exercising a Company paid move, the pilot may (at his option) be returned to the pilot's previous base at Company expense within two (2) years of the effective date of the furlough.  A pilot will be eligible for such a move only if it is exercised prior to his return to duty.  If the pilot is recalled to his last active base, the pilot will be responsible for the costs associated with the move.  If the pilot is recalled to a base other than the one from which he was furloughed, the pilot will be entitled to the value of the move from the furloughed base to the new base.

I.  Pilots on furlough shall receive on line space available pass privileges for a minimum of six (6) months or a period equal to the pilot's actual length of service, if greater, commencing on the first day of the month following the date of the pilot's last furlough pay.

**Part 4 - Furlough Pay**

A.  A pilot who is furloughed shall receive furlough pay for the period of time of active service as specified below:

| | |
|---|---|
| 1 year of service | 1/2 month |
| 2 years of service | 1 month |
| 3 years of service | 1-1/2 months |

advanced by Continental as to why Section 23 does not apply to the situation at hand is based on the bankruptcy court's finding that the Red Book's furlough scheme "would be impossible to administer in the case of a total cessation of Company operations." In Re Continental Airlines Corp., 64 B.R. 882, 888 (Bankr. S.D. Tex. 1986). The bankruptcy court was referring to the "elaborate and comprehensive scheme to handle partial layoffs" or "daisy-chain" procedure set out in Part 1.D. of Section 23 dealing with reductions in force. Under this scheme, vacancies resulting from reductions in force are filled using a system-wide bidding process and through displacement of junior pilots by senior pilots. The bankruptcy court reasoned that because such a "daisy chain" procedure could not be used in a total shutdown, Section 23 must contemplate only partial shutdowns, and thus only a partial shutdown may qualify as a "furlough."

We find that the "daisy-chain" procedure was not necessary for a furlough under the terms of the Red Book, and therefore the application of Section 23 does not turn on whether the shutdown was

| 4 years of service | 2 months |
| 5 years of service | 2-1/2 months |
| 6 years of service | 3 months |
| 7 years of service | 3-1/2 months |
| 8 years of service | 4 months |
| 9 years of service | 4-1/2 months |
| 10 years of service or more | 5 months to pay |

* * *

D.   Full furlough pay provisions shall apply each and every time a pilot is placed on furlough status.

* * *

17

partial or total. The bankruptcy court was correct that the daisy chain procedure could not have been implemented during a total shutdown of operations. However, the daisy chain procedure is described in part of Section 23 dealing with reductions in force; Part 1 does not mention furloughs. Furloughs are dealt with separately in Parts 3 and 4 of Section 23. Furthermore, even if the procedure in Part 1 does apply to furloughs, Part 1 does not contain any mandatory language regarding the implementation of the procedure in a furlough situation. Similarly, Parts 3 and 4 do not even refer to the daisy chain procedure, much less make the procedure a mandatory requirement in the event of a pilot furlough. We therefore conclude that Continental's failure to invoke the daisy chain procedure described in Section 23, Part 1, does not indicate that no pilot furlough took place on September 24, 1983.

Section 23, Part 4, which sets out a furlough pay schedule, provides for furlough pay ranging from 1/2 month's pay for pilots who have actively served for at least one year to 5 months' pay for pilots who have actively served for 10 or more years. Continental therefore contends that to hold Continental responsible for furlough pay would provide a windfall to the pilots. The bankruptcy court agreed, stating that to require Continental to pay these amounts for a three-day shutdown would lead to "absurd results . . . virtually guaranteeing a windfall for the entire pilot and flight attendant workforce." 64 B.R. at 888.

The furlough pay scale contained in Section 23, Part 4 of the Red Book is part of the negotiated contract between the parties.

18

The furlough payments, scaled according to the pilots' length of service, are due regardless of the length of the furlough. The furlough payments are not considered part of wages or compensation; these aspects of the pilots' employment are covered in separate sections of the contract. The furlough provisions thus do not protect the pilots from loss of pay; instead, they serve as a disincentive for Continental to impose arbitrary, unexpected shutdowns. As the pilots point out, that the furlough payments serve as a penalty on Continental will not always render an absurd result. In the event of an extended furlough, the furlough pay scale could work to Continental's advantage. In short, Continental cannot manipulate the provision which Continental negotiated as part of the collective bargaining agreement to work to its advantage in the situation at hand by using the absence of any language regarding the length of the furlough against the pilots. Continental may not use the short-term nature of the shutdown as a shield to protect the company from payment of amounts justly due its employees.

Because our holding that the September 24-27 shutdown constituted a furlough is based solely on the construction of the Red Book, we need not address the pilots' arguments regarding the commonly understood meaning of furlough[7] or the Department of

---

[7] The pilots urge that because a "furlough" is not specifically defined in the Red Book, the legal presumption is that the parties intended the "customary broad meaning" of the term. Appellant's Brief at 15. The pilots discuss the meaning given to "furlough" by various courts, by Congress in the Civil Service Reform Act, and by Webster's dictionary.

Labor's opinion regarding Continental's shutdown.[8]  The Red Book comprises the sole agreement between the parties, and no reference to sources outside the Red Book is necessary in this case.

*Summary Judgment*

In evaluating a summary judgment motion, the reviewing court applies the same standard that governs the district court.  <u>Latimer v. Smithkline & French Lab</u>., 919 F.2d 301, 303 (5th Cir. 1990); <u>Waltman v. International Paper Co</u>., 875 F.2d 468, 474 (5th Cir.

---

In <u>Fishgold v. Sullivan Drydock & Repair Corp</u>., the Court stated that a furlough is a "form of lay-off", and defined "lay-off" as "A period during which a workman is temporarily dismissed or allowed to leave his work . . ."  328 U.S. 275, 287 & n. 11, 66 S. Ct. 1105, 90 L.Ed. 1230 (1946) (quoting Oxford English Dictionary, Supp.).  Section 7511(a)(5) of the Civil Service Reform Act defines "furlough" as "the placing of an employee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reasons."  54 U.S.C. § 7511(a)(5).  Additionally, Webster's dictionary defines "furlough" as "a temporary lack of employment due to economic conditions."  Webster's Third New International Dictionary 923 (1961).

[8]     In furtherance of their argument that Continental's three-day shutdown constituted a furlough, the pilots point to an opinion letter issued by the Department of Labor (DOL) in response to an inquiry by a member of the O'Neill group as to whether he was entitled to designated status under the labor protective provisions of the Airline Deregulation Act, 49 U.S.C. § 1552(d).  Record, Vol. 2 at 130, Appendix 21 at 3.  The letter states as follows:

First, the Department stands by its earlier opinion on the designated status of the pilots.  The nature of Continental's layoff admittedly differed from that which was common to the industry, but it still must be construed as a constructive furlough or termination.  While the substantial reduction in wages and benefits and changes in work rules may have been comparable to standards at some other carriers, the abrogation of the collective bargaining agreement made Continental's action radically different.

20

1989).  Summary judgment is proper when, viewing all the evidence in light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); <u>Waltman</u>, 875 F. 2d at 474.

This court has the power to render summary judgment for a nonmoving party if we find that the moving party is not entitled to summary judgment and that no factual dispute exists and the nonmoving party is entitled to summary judgment as a matter of law. 6 **James W. Moore, et al., Moore's Federal Practice**, ¶ 56.12 at 161-65 (2d ed. 1991); <u>Jensen v. Snellings</u>, 841 F.2d 600, 618 (5th Cir. 1988); <u>E.C. Ernst, Inc. v. General Motors Corp</u>., 537 F.2d 105, 109 (5th Cir. 1976); <u>Black Warrior Elec. Membership Corp. v. Mississippi Power Co</u>., 413 F.2d 1221, 1226 (5th Cir. 1969). Because we hold that on the construction of the Red Book, Continental's three-day shutdown constituted a furlough of the pilots, we reverse the bankruptcy court's order granting summary judgment in favor of Continental.  Moreover, we find that no factual dispute as to whether a furlough occurred exists, and that the pilots are entitled to summary judgment as a matter of law.

*Facing (Contract) Rejection*

Immediately after Continental filed its bankruptcy petition on September 24, 1983, the company filed a motion in bankruptcy court to reject its labor contracts with ALPA and the Union of Flight Attendants (UFA) pursuant to 11 U.S.C. § 365.  The bankruptcy court

21

approved Continental's rejection of its labor contracts. ALPA and UFA then filed proofs of claim for contract rejection damages, and the bankruptcy court granted summary judgment in favor of Continental, disallowing all contract rejection claims. This court, in In Re Continental Airlines Corp., 901 F.2d 1259 (5th Cir. 1990), cert. denied, ___ U.S. ___, 113 S. Ct. 87, 121 L. Ed. 2d 50 (1992), affirmed the bankruptcy court's order granting partial summary judgment in favor of Continental and disallowing contract rejection damages for time periods when the employees were on strike, but vacated the bankruptcy court's order disallowing all contract rejection claims.

Under Bankruptcy Code § 365(g), "the rejection of an executory contract . . . of the debtor constitutes a breach of [the] contract . . . ." 11 U.S.C. § 365(g); see also Matter of Brady, Texas, Mun. Gas Corp., 936 F.2d 212, 214 (5th Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. 657, 116 L. Ed. 2d 748 (1991). Section 365(g)(1) goes on to state that if the contract has not been assumed under § 365 or under a plan confirmed under 11 U.S.C. chapters 9, 11 or 13, the breach is deemed to take place "*immediately before* the date of the filing of the petition." 11 U.S.C. § 365(g)(1) (emphasis added). In its order approving Continental's rejection of the Red Book, the bankruptcy court ordered the contract rejection effective as of the date of the bankruptcy filing. However, this court noted in its decision cited above that under 11 U.S.C. § 365(g)(1), when a contract is rejected pursuant to § 365, the agreement is deemed breached the day *before*

22

the Chapter 11 petition was filed.  In Re Continental Airlines Corp., 901 F.2d at 1264.

In the instant action, the district court held that Continental's rejection of the collective bargaining agreement between the parties removed any possible basis for the pilots' furlough claims.  Continental argues on appeal that because the collective bargaining agreement was deemed breached as of September 23, 1983, the furlough provisions contained therein no longer were in effect on September 24, when the pilots contend Continental placed them on furlough.  Alternatively, Continental argues that the pilots' furlough pay claims are subsets of their claims for contract damages.  The pilots contend that precisely when the breach was deemed to occur is irrelevant, because the purpose of § 365(g) is to ensure that the creditor with a rejection claim has at least a prepetition claim allowable in bankruptcy, not to relieve the debtor of any contractual liability to the creditor that has accrued under the contract.  They also argue that contract rejection damages compensate the pilots for the loss of contract rights, such as seniority and recall rights and rights to wages and union representation, and not for the three-day shutdown during which no work was available.

Significantly, § 365(g)(1) speaks only in terms of "breach." The statute does not invalidate the contract, or treat the contract as if it did not exist.  To assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached.  Furthermore, a party aggrieved by

23

contract rejection may assert a claim for damages. 11 U.S.C. § 502(g); <u>Brady</u>, 936 F.2d at 214.[9] Contract rejection damages are based upon what an employee would have made under the rejected contract. <u>See</u> <u>In Re Continental Airlines Corp</u>., 901 F.2d at 1265.[10] Thus inconsistency again arises in the notion that damages may be awarded on the basis of the rejected contract, the provisions of which, according to Continental, are no longer in effect as of the date of rejection.

Continental cites <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513, 104 S. Ct. 1188, 79 L.Ed. 2d 482 (1984), in support of its arguments regarding the purpose and scope of § 365(g)(1). In <u>Bildisco</u>, the Court stated that "While the Board insists that § 365(g)(1) deals only with priorities of payment, the implications from the decided cases are that the relation back of contract rejection to the filing of the petition in bankruptcy involves more

---

[9] 11 U.S.C. § 502(g) provides as follows:

> A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

[10] In ruling on the pilots' and flight attendants' contract rejection damages claims in this case, this court held that "employees whose collective bargaining agreements are rejected in a Chapter 11 bankruptcy proceeding are entitled to future wages and benefits as contract rejection damages under 11 U.S.C. § 502(g)", <u>In Re Continental Airlines</u>, 901 F.2d at 1260, based upon what the employees would have made had the contract not been rejected. <u>Id</u>. at 1265.

24

than just priority of claims." 465 U.S. at 531. However, we think that Continental misreads this statement to say that § 365(g)(1), in addition to dealing with priority of claims, deals with the continued existence of the terms of the contract. The cases cited by the Court in support of its statement above do not support Continental's proposition that rejection of the Red Book rendered the agreement ineffective, thereby relieving Continental of any liability under the agreement. See cases cited 465 U.S. at 531, n.13. Instead, the Court appears to be referring to the contract damages available to a creditor when a collective bargaining agreement is rejected pursuant to § 365(g)(1), and not to any lessened obligations of the debtor resulting from that rejection. Section 365(g)(1) indeed involves more than priority of claims. As we have explained above, however, it is difficult to reconcile a holding that damages are due when a collective bargaining agreement is rejected and an argument that that agreement at the same time does not effectively exist. An agreement cannot "exist" for one purpose yet take on a "nonexistent" quality which works to the advantage of one party or the other.

In In Re Modern Textile, Inc., 900 F.2d 1184 (8th Cir. 1990), the Eighth Circuit addressed the argument that rejection of a lease under 11 U.S.C. § 365 terminated the debtor's obligations on the lease. The court cited the language of 11 U.S.C. §§ 365, 365(g)(1) and 502(g) in support of its conclusion that "the trustee's rejection of the lease operate[d] as a breach of an existing and continuing legal obligation of the debtor, not as a discharge or

25

extinction of the obligation itself." Modern Textile, 900 F.2d at 1191.  Similarly, Continental's rejection of the Red Book did not extinguish its obligations under the furlough rules contained in the agreement or render the furlough rules inapplicable as of the date of rejection.  We hold that the district court erred in holding that "the rejection of [the Red Book] removes any possible basis for the pilots' claims . . . ."

The House and Senate reports regarding § 365(g) state that the purpose of that section is to "treat rejection claims as prepetition claims."  HR Rep. No. 595, 95th Cong., 1st Sess. 349 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 60 (1978).  In the instant case, the pilots' claims for contract rejection damages were properly treated as prepetition claims allowable in bankruptcy in accordance with the purpose of § 365(g) stated above.  However, the award of contract rejection damages to the pilots who did not strike in no way precludes the pilots from making furlough pay claims pursuant to Section 23 of the Red Book.  The claims for contract rejection damages and the furlough pay claims are two distinct and separate sets of claims.  This court previously has ruled on the contract rejection damages issue, and we need not revisit that issue here.  We agree with the pilots that they may maintain both actions and that the furlough claims must be examined independently of any contract rejection issues previously raised.

We believe that the inconsistency demonstrated in the conclusions of the bankruptcy court and this court as to the precise day on which the contract is deemed breached is immaterial

in light of our holding that the rejection of the Red Book did not relieve Continental of its furlough pay obligations arising from the three-day shutdown.

*Estimation and Recusal*

The pilots appeal the bankruptcy court's estimation of their furlough pay claims at zero. Bankruptcy Code § 502(c) provides as follows:

> There shall be estimated for purpose of allowance under this section --
>
> (a) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or
>
> (b) any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. § 502(c). The bankruptcy court, based on its conclusion that the pilots' claims ultimately were without merit, found that the claims necessarily must be estimated at zero pursuant to § 502(c). In Re Continental Airlines, 64 B.R. at 890. The bankruptcy court noted that "liquidation of [the] furlough claims through arbitration would unduly delay [Continental's] reorganization." Id. at 887. The district court affirmed the zero valuation of the claims, stating that in light of the "enormous task" which faced the bankruptcy court, the § 502(c) estimation process was an appropriate means by which to facilitate the confirmation of Continental's reorganization plan in the event summary judgment on its motions was denied. The district court asserted that liquidation of the pilots' furlough pay claims could not have been accomplished expeditiously in light of the large

27

number of individual claims filed, and that the bankruptcy court avoided "undue delay in the administration of this case" by utilizing the § 502(c) estimation process.

In order for the estimation process of § 502(c) to apply, a claim must be contingent or unliquidated and fixing the claim must entail undue delay in the administration of justice. The pilots argue that the bankruptcy court and the district court failed to establish these prerequisites for utilization of the estimation process, and that even if the requirements had been met, the bankruptcy court failed to properly estimate the claims, using estimation as a vehicle for granting Continental's summary judgment motion.

In Matter of Ford, 967 F.2d 1047 (5th Cir. 1992), this court observed that Bankruptcy Code § 502(c)(1) serves two purposes: 1) the section is designed to avoid the need to await the resolution of outside lawsuits to determine issues of liability or amount owed by means of anticipating and estimating the likely outcome of these actions, and 2) the section is designed to promote a fair distribution to creditors through a realistic assessment of uncertain claims. Id. at 1053. However, in cases where a claim is neither contingent nor unliquidated, estimation is "simply inappropriate." Id.

A bankruptcy court's estimation of the value of an unliquidated claim, the liquidation of which would unduly delay the proceedings, may be disturbed on appellate review only in the event of an abuse of discretion. Matter of Brints Cotton Mktg., Inc.,

28

737 F.2d 1338, 1341 (5th Cir. 1984). Because we find, however, that Judge Roberts should have stood recused from the case, and, for reasons set forth below, that his failure to stand recused pursuant to 28 U.S.C. § 455(a) does not constitute harmless error with regard to his ruling on the estimation of the pilots' claims, we vacate the portion of the June 27 order estimating the pilots' claims at zero and remand the issue to the bankruptcy court for determination by a new bankruptcy judge.

Twenty-eight U.S.C. § 455(a) states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Id. The pilots argue that Judge Roberts should have stood recused from the case because shortly after issuing the order granting Continental's motion for summary judgment, Judge Roberts accepted an offer for partnership in the law firm representing Continental. The pilots assert that Judge Roberts' actions in connection with the law firm and in publicly praising Continental's president created an appearance of impropriety, and that Judge Roberts' failure to recuse himself requires the reversal of the bankruptcy court's order granting summary judgment.

This court addressed the issue of Judge Roberts' failure to stand recused with regard to his summary judgment order disallowing the pilots' and flight attendants' contract rejection claims in In Re Continental Airlines Corp., 901 F.2d 1259 (5th Cir. 1990). The court noted that recusal may be mandated even though no actual partiality exists, Hall v. Small Business Admin., 695 F.2d 175, 178

(5th Cir. 1983), and that the standard for recusal is an objective one: whether a "reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." 901 F.2d at 1262 (quoting Health Services Acquisition Corp. v. Liljeberg, 796 F.2d 796, 800 (5th Cir. 1986), aff'd, 486 U.S. 847, 108 S. Ct. 2194, 100 L.Ed.2d 855 (1988)). The panel discussed the appearances of the situation, concluding that

> when an offer of employment was received the day after [Judge Roberts'] approval of $700,000 in legal fees to the firm making the offer, Judge Roberts was "required to take the steps necessary to maintain public confidence in the judiciary." In the circumstances of this case Judge Roberts should either have rejected the offer outright, or, if he seriously desired to consider accepting the offer, stood recused and vacated the rulings made shortly before the offer was made. Although we are confident that Judge Roberts committed no substantive impropriety in his handling of the motions in this case, we nevertheless conclude that recusal was mandated by the appearances of the situation which we have described.

901 F.2d at 1262-63 (quoting Liljeberg, 486 U.S. at 861, 108 S. Ct. at 2202-03, 100 L.Ed.2d at 873). This court went on to hold, however, that the § 455(a) violation constituted harmless error. Id. at 1263. The panel carefully considered three factors in determining whether reversal was mandated: i) the risk of injustice to the parties in this particular case; ii) the risk that the denial of relief will produce injustice in other cases; and iii) the risk of undermining the public's confidence in the judicial process. Id.

With respect to the first factor, the court concluded that "the risk of injustice to the parties in allowing a summary judgment ruling to stand is usually slight" because summary

30

judgment rulings are subject to *de novo* review, with the reviewing court utilizing criteria identical to that used by the court below. Id. The panel stated that "[i]n cases where we would otherwise affirm such a ruling, little would be gained by vacating and remanding with instructions that it be essentially reinstated." Id.

The court concluded with regard to the second factor that its failure to vacate would not be likely to produce injustice in other cases, but would serve as a caution to other judges contemplating private employment following retirement. Finally, the court concluded that its ruling that Judge Roberts' actions violated § 455(a) should serve to restore some of any public confidence lost as a result of the violation, and therefore, that the violation constituted harmless error.

In considering the issue of Judge Roberts' recusal in the instant case, we apply the same standard and carefully consider the same factors as did this court in its opinion discussed above. Using the same standard in determining whether a § 455(a) violation has taken place, and applying that standard to the same set of circumstances described in this court's previous opinion, we find that Judge Roberts violated 28 U.S.C. § 455(a) in his failure to stand recused from this case.

Similarly, we consider the same set of factors in determining whether the § 455(a) violation in this case constitutes harmless error. The only difference between the two cases arises in the consideration of the first factor: the risk of injustice to the

31

parties in this particular case.  In <u>In Re Continental Airlines</u>, this court affirmed the bankruptcy court's order granting summary judgment, and asserted that nothing would be gained by vacating and remanding the case because of the § 455(a) violation.  In this case, after reviewing the bankruptcy court's order de novo, we reverse the bankruptcy court's order and grant summary judgment in favor of the pilots; similarly, nothing would be gained by vacating and remanding this case when we have utilized the same criteria as the courts below in ruling on the summary judgment issue.

With regard to the second and third factors, we adopt the reasoning of this court in <u>In Re Continental Airlines</u>:  the risk that the denial of relief with regard to the summary judgment issue will produce injustice in other cases is slight, and the risk of undermining the public's confidence in the judicial process is decreased by our ruling that a § 455(a) violation did indeed occur in this case and our plenary review and reversal of the bankruptcy court's order granting summary judgment.  Accordingly, we hold that the violation of 28 U.S.C. § 455(a) constitutes harmless error with regard to the portion of the bankruptcy court's order granting summary judgment in favor of Continental.

The standard of review which a reviewing court must utilize in ruling on a bankruptcy court's estimation of the value of an unliquidated claim, that is, whether the bankruptcy court's estimation constituted an abuse of discretion, demands a different result when considering the issue of whether a § 455(a) violation constitutes harmless error.  The risk of injustice to the parties

is much greater when a court lacks broad powers of review. In this instance, if we do not vacate the bankruptcy court's order estimating the pilots' claims at zero and remand the estimation issue to the district court, the parties may remain subject to an order entered by a judge who has violated 28 U.S.C. § 455(a), yet has not abused his discretion in entering the order.

Additionally, the risk of undermining the public's confidence in the judicial process also is greater in this instance than the risk posed when dealing with summary judgment review. We are concerned with more than appearances when dealing with a discretionary ruling of a lower court; we are concerned with parties receiving fair treatment of their claims and maintaining the public's confidence and trust that should a violation of § 455(a) occur, the welfare of the parties will take priority over convenience or ease of disposing of the parties' claims.

The risk that the denial of relief will produce injustice in other cases, however, is not great should we deny relief on the bankruptcy court's estimation order; by finding that a § 455(a) violation occurred, we caution other judges, and because Continental's plan of reorganization is complete, injustice to other Continental creditors resulting from any delay is minimal. However, we find that the increased risk of injustice to the parties and of undermining the public's confidence in the judicial process far outweighs any decrease in the risk of injustice to other parties in denying relief from the bankruptcy court's estimation order. Accordingly, we hold that the § 455(a) violation

33

did not constitute harmless error with regard to the portion of the bankruptcy court's order estimating the pilots' claims at zero, and therefore we vacate such portion of the bankruptcy court's order and remand the issue to the bankruptcy court for determination by a new bankruptcy judge.

*Conclusion*

We reverse the bankruptcy court's order granting summary judgment in favor of Continental, and because we find that there is no genuine issue as to any material fact and that the pilots are entitled to judgment as a matter of law, we grant summary judgment in favor of the pilots. We vacate the portion of the bankruptcy court's order estimating the pilots' furlough claims at zero, and remand the issue to the bankruptcy court for calculation of the amount of the pilots' claims by a new bankruptcy judge.

REVERSED AND REMANDED for calculation of claims.