NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3740-16T2

JED GOLDFARB,

      Plaintiff-Appellant/
      Cross-Respondent,

v.

DAVID SOLIMINE,

      Defendant-Respondent/
      Cross-Appellant.

_____

Argued December 5, 2018 – Decided June 26, 2019

Before Judges Koblitz, Ostrer and Mayer.

On appeal from the Superior Court of New Jersey,
Law Division, Essex County, Docket No. L-3236-14.

Andrew M. Moskowitz argued the cause for
appellant/cross-respondent (Javerbaum Wurgaft Hicks
Kahn Wikstrom & Sinins, PC, attorneys; Andrew M.
Moskowitz, of counsel and on the briefs).

Carmine A. Iannaccone argued the cause for
respondent/cross-appellant (Epstein Becker & Green,
PC, attorneys; Carmine A. Iannaccone, of counsel and
on the brief; Michael D. Thompson, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

This appeal arises out of defendant's broken promise to hire plaintiff to manage a portion of defendant's assets and those of his brother and father. Defendant and plaintiff agreed that plaintiff would receive a salary plus a percentage of investment gains. In reliance on that promise, but before receiving a confirming writing, plaintiff quit his job with an investment firm. Then, defendant reneged. After several months, plaintiff found another job. For the first year at his new employment, he earned less than the $250,000 annual base salary at the promised job, and he continued to earn less than the $400,000 average yearly compensation he alleged he earned at his prior job.

Proceeding solely on a theory of promissory estoppel, plaintiff sought reliance damages consisting of the difference between what he would have earned had he not quit his job, and what he ultimately earned after securing substitute employment. He appeals from the judgment, after a jury trial, of $237,000 minus applicable taxes. Plaintiff contends the trial court (1) improperly barred his damages expert, who opined on what plaintiff would have earned had he not quit his job; and (2) erred in limiting his damages to the difference between the promised $250,000 base salary and his actual earnings for seventeen months (after which they exceeded $250,000).

Defendant cross-appeals, contending that plaintiff's claim was legally and equitably barred by regulations under the New Jersey Securities Law that

require a written contract to provide services as an investment adviser; Financial Industry Regulatory Authority (FINRA) rules limiting registered persons from providing services outside their current employment with a member firm; and the unclean hands doctrine.

Before reaching these issues, we address plaintiff's argument that the trial judge should have recused herself upon plaintiff's pre-trial motion. Plaintiff moved for the judge's recusal after learning that a defense attorney, in an ex parte communication, sought the judge's assignment to the case, and the judge responded by specifically requesting the assignment from the presiding judge. We conclude this "judge-shopping" created an appearance of impropriety. On that basis, we vacate the trial judge's challenged rulings, but affirm the jury finding of liability. We decide de novo or as a matter of original jurisdiction that plaintiff was entitled to present evidence of his reliance damages; his expert should have been permitted to testify; and his claims were not barred by law or equity. We remand for a new trial on damages before a different judge. We turn first to the recusal motion.

I.

A.

The judge disclosed the ex parte communication in chambers, and confirmed it on the record. In summary, one of the judge's former law clerks,

A-3740-16T2

who was an associate at the defense firm, contacted the judge by text to inquire if she was available to preside over the trial. The judge apparently had no prior connection to the case, which involved significant pre-trial motion practice. The former clerk identified the senior attorney at her firm who would try the case. The judge understood that the attorney liked to appear before her. The judge then spoke to the presiding judge and, relying on her seniority, secured assignment of the case.[1]

When plaintiff's counsel learned that the judge's assignment of the case resulted from an ex parte contact with defense counsel, he sought the judge's recusal. At the outset of the colloquy, the judge reproached plaintiff's counsel for relying on statements made in chambers:

> [PLAINTIFF'S COUNSEL]: Judge, you stated in chambers that you had received a text message from [defense counsel's] firm?
>
> THE COURT: No . . . I did not say that. Let me be very clear about what I said, and let us be very clear about the following; neither one of you will be in my chambers for the rest of this trial. I am appalled that what had been the bedrock of practice, that what a judge tells you in chambers stays in chambers seems no longer to be the rule. So let me be very clear about what I said and I didn't say.

---

[1] Both the trial judge and presiding judge are now retired. There is no indication in the record that the presiding judge knew that a former clerk's ex parte communication prompted the judge's request.

The judge then summarized what she had disclosed in chambers about the assignment request:

> [Defense counsel's] firm had hired a prior law clerk of mine . . . I think that was five years ago . . . I told both counsel that [she] had texted me this morning saying that [defense counsel] was waiting around for a judge and I said well I'll be in and I'd love to take the case.

In the course of the on-the-record colloquy, the judge later added that she requested the assignment from the presiding judge:

> I'll go further. I stopped in this morning and said, "You got a case around here, because I'm a senior Judge, I don't like doing car accident cases." So in some ways I get my pick. . . . Because that's what 25 years on the bench will get you.

Once informed of the trial attorney's name, the judge said she understood he preferred to try the case before her. "I got a text from a former law clerk that said [defense counsel] has a case, are you there? Yeah, he likes appearing before me."

Plaintiff's counsel argued that the ex parte contact amounted to "judge shopping, because they like you and they want you to hear the case."

The judge rejected the argument, stating that it was common practice for attorneys to inquire about a judge's availability to take their case.

> Counsel . . . do you have any idea how many lawyers stop in my chambers on a weekly basis and say, Judge where you at, are you open? No, not today. Well

A-3740-16T2

when will you be open? Probably by Wednesday if you can get [the presiding judge] to wait that long.

The judge added that her former law clerks "do it all the time . . . hey Judge, the partner's coming, are you open? Yeah, I'm open." The judge concluded, "There is nothing untoward about a judge telling a lawyer, I'm going to be open . . . bring your case my way." The judge stated that she believed attorneys sought her assignment because of her experience and her reputation, and she challenged plaintiff's counsel to cite instances of bias or favoritism.

At trial, plaintiff contended that defendant promised him a base salary of $250,000 to $275,000, plus a fifteen- to twenty-percent share of gains generated on a portfolio of $75-100 million. Mid-trial, the judge barred plaintiff's damages expert. The judge also limited plaintiff's form of damages. As a result, plaintiff was prevented from claiming damages equal to the difference between what he would have earned had he not quit his job in reliance on defendant's promise, and his actual earnings after defendant reneged.[2] The court utilized the low end of the base salary for its instruction on damages.

---

[2] Plaintiff was also barred from any damages related to defendant's investment gains based on the advice plaintiff gave him before he left his prior employer. Plaintiff does not contest that ruling. Also, he dismissed his claims for quantum meruit, based on defendant's subsequent investment gains, and for breach of contract.

The jury found that defendant made a sufficiently clear and definite promise of employment, such that a reasonable person would rely on it; defendant expected plaintiff to rely on the promise; and plaintiff quit his job in reliance on the promise of employment. It awarded damages based on the difference between his actual earnings and the base $250,000 salary defendant promised.

On appeal, plaintiff contends the court erred in denying his recusal motion. Plaintiff does not expressly ask us to reverse the judgment on the basis of this error, but he asks us to consider it in reviewing the court's challenged rulings on expert testimony and damages. In his reply brief, plaintiff further contends that the court's actions reflected actual partiality toward defendant. Defendant responds that the judge did not err in denying the recusal motion, and that the former law clerk's ex parte contact was a permissible inquiry about scheduling.

B.

In addressing the recusal issue, we are guided by several fundamental principles. Generally, recusal motions are "entrusted to the sound discretion of the judge and are subject to review for abuse of discretion." State v. McCabe, 201 N.J. 34, 45 (2010). However, we review de novo whether the judge applied the proper legal standard. Ibid.

A judge must act in a way that "promotes public confidence in the independence, integrity and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Code of Judicial Conduct Rule 2.1; see also In re Reddin, 221 N.J. 221, 227 (2015) (noting "the 'bedrock principle' that a judge should uphold the integrity and independence of the Judiciary" (quoting DeNike v. Cupo, 196 N.J. 502, 514 (2008))); In re Advisory Letter No. 7-11 of Supreme Court Advisory Comm. on Extrajudicial Activities, 213 N.J. 63, 75 (2013) (stating "[t]he purpose of our judicial disqualification provisions 'is to maintain public confidence in the integrity of the judicial process, which in turn depends on a belief in the impersonality of judicial decision making'" (quoting United States v. Nobel, 696 F.2d 231, 235 (3d Cir. 1982))).

"[A]n appearance of impropriety is created when a reasonable, fully informed person observing the judge's conduct would have doubts about the judge's impartiality." Code of Judicial Conduct, cmt. 3 on Rule 2.1 (2016); DeNike, 196 N.J. at 517 (enunciating the standard).[3] Judges must step aside from "proceedings in which their impartiality or the appearance of their

---

[3] This standard applies to a judge's judicial conduct. "To assess whether a judge's personal behavior creates an appearance of impropriety" the standard is: "Would an individual who observes the judge's personal conduct have a reasonable basis to doubt the judge's integrity and impartiality?" In re Reddin, 221 N.J. at 233.

impartiality might reasonably be questioned."  Code of Judicial Conduct Rule 3.17(B).  A judge must also do so if "there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."  R. 1:12-1(g).

A movant need not show actual prejudice; "potential bias" will suffice. State v. Marshall, 148 N.J. 89, 276 (1997) (quoting State v. Flowers, 109 N.J. Super. 309, 312 (App. Div. 1970)); see also Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001).  "In other words, judges must avoid acting in a biased way or in a manner that may be perceived as partial."  DeNike, 196 N.J. at 514.

In particular, a judge may not "initiate or consider ex parte or other communications concerning a pending or impending proceeding."  Code of Judicial Conduct Rule. 3.8.  However, "[i]n general . . . discussions regarding scheduling . . . are not considered to constitute ex parte communications in violation of [the] rule."  Code of Judicial Conduct, cmt. 4 on Rule 3.8.

Judges may not "err on the side of caution and recuse themselves unless there is a true basis that requires disqualification."  Johnson v. Johnson, 204 N.J. 529, 551 (2010).  A judge's duty to sit where appropriate is as strong as the duty to disqualify oneself where sitting is inappropriate.  Ibid.; Hundred E. Credit Corp. v. Eric Schuster Corp., 212 N.J. Super. 350, 358 (App. Div. 1986)

("It is not only unnecessary for a judge to withdraw from a case upon a mere suggestion that he is disqualified: it is improper for him to do so unless the alleged cause of recusal is known by him to exist or is shown to be true in fact.").

Judge-shopping – an attorney's attempt to have a particular judge try his or her case – may undermine public confidence in the impartial administration of justice. See United States v. Phillips, 59 F. Supp. 2d 1178, 1180 (D. Utah 1999) (stating that a random case assignment system was designed to "prevent judge shopping by any party, thereby enhancing public confidence in the assignment process" (quoting United States v. Mavroules, 798 F. Supp. 61, 61 (D. Mass. 1992))). Judge-shopping is problematic for two reasons. First, "judge-shopping by one party can influence case outcomes in a way that is unfair to the non-shopping party. Second, judge-shopping creates a perception of partiality that undermines the legitimacy and credibility of the courts." Alex Botoman, Note, Divisional Judge-Shopping, 49 Colum. Hum. Rts. L. Rev. 297, 321 (2018). "[W]hen the public begins to believe that attorneys have the power to select judges . . . its belief in the impartiality of the judicial system is eroded." Theresa Rusnak, Related Case Rules and Judge-Shopping: A Resolvable Problem? 28 Geo. J. Legal Ethics 913, 913 (2015).

Our Supreme Court has expressed its disapproval of defendants' manipulation of the system to secure the removal of a judge they dislike. See, e.g., State v. Dalal, 221 N.J. 601, 607-08 (2015). It is just as damaging to the integrity of the judicial process when parties secure, without the opposition's knowledge or consent, the assignment of a judge they prefer. When the judge affirmatively facilitates his or her selection by that one party, public confidence and the appearance of impartiality are further undermined.

C.

Applying these principles, we are persuaded that the trial judge abused her discretion in denying the recusal motion. Contrary to Code of Judicial Conduct Rule 3.8, the judge here considered and responded to an inappropriate ex parte communication from her former law clerk. The contact was not about scheduling, such as when the trial would occur. It was about judicial assignment – that is, who would preside.

The prohibition of ex parte communications by attorneys does not bar "routine and customary" scheduling communications, but it "does apply to communications for the purpose of having a matter assigned to a particular court or judge." Restatement (Third) of the Law Governing Lawyers § 113 cmt. c (Am. Law Inst. 2000). The reason is apparent. "The prohibition applies to communications about the merits of the cause and to communications about

11

a procedural matter the resolution of which will provide the party making the communication substantial tactical or strategic advantage." Ibid.  As set forth above, judge-shopping communications, by securing a desired assignment, can affect the court's decisions and undermine public confidence in its impartiality. Just as lawyers are prohibited from making such ex parte communications, judges may not consider them.[4]

In this case, the judge's consideration of the ex parte communication, and her active participation in ensuring the case was assigned to her, compounded the usual concerns of judge-shopping and tainted the proceedings with the appearance of partiality.  The source and manner of the ex parte communication – a text message from a former law clerk to the judge's cell phone – exacerbated the improper appearance that one party had exploited a prior relationship with the judge.  A reasonable person, informed of these facts, would have doubts about the judge's impartiality.  Therefore, it is

---

[4]  We add that even in the case of scheduling matters, a court should not consider an ex parte communication if a party would gain an unfair advantage as a result; and if it does consider such a communication, the other parties should have an opportunity to respond. See Model Code of Judicial Conduct Rule 2.9(A)(1) (Am. Bar Ass'n 2011) (stating that a court may consider an ex parte non-substantive scheduling communication only if "the judge reasonably believes that no party will gain a procedural, substantive, or tactical advantage as a result . . . and . . . makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond").

unnecessary to reach plaintiff's argument that the judge in fact favored defendant in the course of her rulings and conduct of the case.

The record does not disclose whether, as the trial judge contends, it is common in her vicinage for attorneys to inquire directly of judges about their availability. We withhold comment on such a practice, noting there is a significant difference between ascertaining whether a judge will be available and inquiring whether the judge would agree to preside over a particular case. See Restatement § 113 cmt. c. Exacerbating the situation here, the judge affirmatively responded to such an ex parte communication and secured the case assignment.

In sum, having created an appearance of impropriety and partiality through her response to an inappropriate ex parte communication, the judge was obliged to step aside. Code of Judicial Conduct Rule 3.17(B); R. 1:12-1(g). We turn next to the question of remedy.

D.

When a trial judge's actual or apparent impartiality "might reasonably be questioned," Code of Judicial Conduct Rule 3.17(B), and the trial judge fails to step aside, the reviewing court must fashion a remedy "to restore public confidence in the integrity and impartiality of the proceedings, to resolve the dispute in particular, and to promote generally the administration of justice."

13                                              A-3740-16T2

DeNike, 196 N.J. at 519. The appropriate relief depends on the facts and circumstances.[5]

In DeNike, the trial judge commenced negotiations about post-retirement employment with the plaintiff's law firm after the judge rendered a bench-trial verdict, but while substantive issues regarding the form of the judgment remained pending. The Supreme Court held that "a knowledgeable, objective observer" could reasonably conclude that the negotiations "infected all that occurred beforehand." Therefore, the Court held that the appearance of impropriety required vacating the judgment and ordering a new trial before a new judge. Id. at 518-19.

In Chandok v. Chandok, 406 N.J. Super. 595, 606-07 (App. Div. 2009), we required retrial of a matrimonial case where, two months before trial, defendant retained the judge's former law partner, with whom the judge had an earlier acrimonious relationship. We considered, but found inadequate, the option of remanding to a new judge to decide the divorce case based on the

---

[5] We are also informed by the United States Supreme Court's holding that, in determining whether to vacate a judgment for a trial judge's failure to recuse in a "proceeding in which [the judge's] impartiality might reasonably be questioned" under 28 U.S.C. § 455(a), the court should consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863 (1988).

record and to reconsider the rulings that the first judge had issued after his former partner entered the case. We noted that a judge confined to reviewing the cold record would be unable to make credibility determinations essential to resolving the case. Id. at 607. For the same reason, we declined to exercise original jurisdiction and decide the case ourselves. Ibid.

However, a new trial is not invariably required to achieve the goals identified in DeNike. Unlike the defendant in DeNike, plaintiff here does not demand a complete retrial. Rather, he asks us to consider the trial judge's failure to recuse herself in the course of resolving the other issues on appeal. To promote economy in the administration of justice, we should endeavor to avoid a retrial that would further burden the party most aggrieved by the trial judge's refusal to step aside. A more surgically crafted form of relief may restore public confidence in the integrity of judicial proceedings while fairly and efficiently resolving the particular dispute.

We note that federal courts have held that a retrial is unnecessary where the appellate court's de novo review would suffice to cure any taint at the trial level. For example, in In re Continental Airlines, 981 F.2d 1450, 1463 (5th Cir. 1993), the Court of Appeals held that the trial judge's failure to recuse did not necessitate a remand on a motion for summary judgment because appellate review of the decision was de novo. "[N]othing would be gained by vacating

A-3740-16T2

and remanding . . . when [the appellate court] . . . utilized the same criteria as the courts below in ruling on the summary judgment issue." Ibid.; see also In re Sch. Asbestos Litig., 977 F.2d 764, 787 (3d Cir. 1992) (stating that vacatur of summary judgment rulings would burden heavily the parties and the court "with little corresponding gain," as those rulings are "subject to plenary review upon final judgment").

On the other hand, federal courts have found it appropriate to vacate, in whole or in part, those trial decisions that it would otherwise review for an abuse of discretion, and to remand for reconsideration by a new judge. Cont'l Airlines, 981 F.2d at 1463 (stating that "[t]he risk of injustice to the parties is much greater when a court lacks broad powers of review" because "the parties may remain subject to an order entered by a judge who has violated 28 U.S.C. 455(a), yet has not abused his discretion in entering the order"); Sch. Asbestos Litig., 977 F.2d at 787 (stating that "[d]eferential review . . . might not cure any prejudice").

We conclude that public confidence will be restored by our leaving in place the jury's findings; vacating the trial judge's rulings challenged on appeal and cross-appeal; deciding those issues de novo or in the exercise of original jurisdiction; and remanding for a new trial on damages. In contrast to both DeNike and Chandok, the fact-finder in this case was a jury, not a judge who

16

was so tainted by the appearance of impropriety as to require a retrial. We see no need to retry the jury's factual findings of liability – unchallenged on cross-appeal – that defendant made a sufficiently clear and definite promise of employment such that a reasonable person would rely on it; defendant expected plaintiff to rely; and plaintiff did, quitting his job. Retrial of those findings would disserve the party aggrieved by the trial judge's refusal to recuse herself, undermine public confidence in the judicial process, complicate resolution of the dispute, and burden the administration of justice. Additionally, remanding the Securities Act and FINRA issues that defendant raises on cross-appeal, which we would normally review de novo as questions of law, see Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), would also disserve the efficient administration of justice and undermine public confidence.

Absent an abuse of discretion, we would normally defer to the trial judge's rulings on the admissibility of expert opinion, see Townsend v. Pierre, 221 N.J. 36, 52 (2015); and the applicability of the unclean hands doctrine, see Untermann v. Untermann, 19 N.J. 507, 517-18 (1955). However, that deference is inappropriate with respect to discretionary rulings tainted by the appearance of impropriety. Yet, unlike the federal courts, we need not remand such discretionary determinations to a new trial judge. Rather, we may

17

exercise original jurisdiction and decide those issues. See R. 2:10-5 (stating that "[t]he appellate court may exercise such original jurisdiction as is necessary to the complete determination of any matter on review"). The record here is sufficient to enable us to do so, and, unlike in Chandok, no essential questions of credibility impede our decision.

We recognize that original jurisdiction "should not be exercised in the absence of imperative necessity." City of Newark v. W. Milford Twp., 9 N.J. 295, 301 (1952). However, "it will be invoked in those situations where the sound administration of justice calls for appellate 'intervention and correction.'" State v. Yough, 49 N.J. 587, 596 (1967) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). This case presents such a situation.

## II.

### A.

We begin with the threshold question presented by defendant's cross-appeal: whether plaintiff's claim is barred by the Securities Law, FINRA rules, or the doctrine of unclean hands.

Defendant contends that the Securities Law requires a detailed writing as a precondition to enforcing a promise to employ an "investment adviser"; plaintiff was seeking employment as an "investment adviser" but lacked a writing; and promissory estoppel cannot afford him relief where a breach of

contract claim would not. We are unconvinced. Plaintiff was exempt from the Securities Law because he was seeking employment with a "family office" and was therefore not deemed an "investment adviser." Furthermore, even if the law did apply, failure to satisfy the writing requirement bars only an action on the unwritten employment contract, not a claim for reliance damages based on promissory estoppel.

Regulations under the Securities Law require that any agreement for compensation of an "investment adviser" be in writing. Investment advisers may not "engage in dishonest or unethical practices," N.J.S.A. 49:3-53(a)(3), and the regulations include, as such practices, "[e]ntering into . . . any investment advisory contract unless such contract is in writing" and details the adviser's compensation and authority, N.J.A.C. 13:47A-6.3(a)(57). A party may not "base any suit on . . . [a] contract" that violates the Securities Law or regulations. N.J.S.A. 49:3-71(h).

However, plaintiff was exempt from these provisions under both state and federal law, which are co-extensive. Under the New Jersey Securities Law, "investment adviser" includes "any person who, for direct or indirect compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, selling or holding securities."

N.J.S.A. 49:3-49(g)(1)(ii). This definition tracks the one found in the federal Investment Advisers Act of 1940 (federal Act), see 15 U.S.C. § 80b-2(a)(11), and expressly excludes from "investment adviser" anyone excluded by the federal Act. N.J.S.A. 49:3-49(g)(2)(vi). The federal Act excludes, among others, "any family office, as defined" by the Securities and Exchange Commission (S.E.C.) rules, regulations or orders. 15 U.S.C. 80b-2(a)(11)(G).[6]

The S.E.C. defines a "family office" as:

> a company (including its directors, partners, members, managers, trustees, and employees acting within the scope of their position or employment) that:
>
> (1) Has no clients other than family clients . . . ;
>
> (2) Is wholly owned by family clients and is exclusively controlled (directly or indirectly) by one or more family members and/or family entities; and
>
> (3) Does not hold itself out to the public as an investment adviser.
>
> [17 C.F.R. 275.202(a)(11)(G)-1(b).]

---

[6] The family office exclusion was adopted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. See Family Offices, 76 Fed. Reg. 37983, 37983-84 (June 29, 2011). The statute preserved S.E.C. policy. See S. Rep. No. 111-176, at 75 (2010) (stating that "[s]ince the enactment of the Investment Advisers Act of 1940, the SEC has issued orders to family offices declaring that those family offices are not investment advisers within the intent of the Act (and thus not subject to the registration and other requirements of the Act)").

The purpose of the family office exemption is to shield private family investments from regulation. See S. Rep. No. 111-176, at 75 (2010) (stating the federal Act was "not designed to regulate the interactions of family members, and registration would unnecessarily intrude on the privacy of the family involved"). Also, underlying the family office exclusion may be "a belief that members of what are typically financially sophisticated families are not in need of the protections and safeguards provided by the [Investment Advisers] Act." Nathan Crow & Gregory S. Crespi, The Family Office Exclusion Under the Investment Advisers Act of 1940, 69 SMU L. Rev. 97, 117 (2016).[7]

Plaintiff established that he was promised a position in such a "family office." According to plaintiff's proofs at trial, defendant promised to hire him to provide investment advisory services exclusively to defendant, his brother and his father, in connection with their wholly-owned fund of $75-100 million.[8] Even if plaintiff were granted discretion in managing or investing the

---

[7] Plaintiff characterized defendant and his family as wealthy, sophisticated investors. Plaintiff contended that defendant reported receiving $200 million upon the sale of the insurance firm his father founded.

[8] The proposed arrangement would have constituted a "family office" even if plaintiff contributed personally to the pool of investment funds, to enhance his commonality of interest with defendant, because the regulation permits "key employees" to invest with family members. See 17 C.F.R. 275.202(a)(11)(G)-
(continued)

funds, defendant and his family members would still have "directly or indirectly" controlled the funds, because they would have retained the power to direct plaintiff. See 17 C.F.R. 275.202(a)(11)(G)-1(d)(2) (defining "control" as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of being an officer of such company").

It is of no moment that, as defendant highlights, plaintiff did not identify the specific entity that would have served as the "company" that employed him. Defendant, his brother and his father constituted an "organized group of persons," qualifying as a "company" under the federal Act. See 15 U.S.C. § 80b-2(a)(5) (defining "company" to mean "a corporation, a partnership, an association, a joint-stock corporation, a trust, or any organized group of persons, whether incorporated or not"); Family Offices, 79 Fed. Reg. at 37984 n.15 (stating that "'company' used throughout rule 202(a)(11)(G)-1 has the

_____

(continued)
1(d)(8); see also Family Offices, 76 Fed. Reg. at 37991 (noting comments that "permitting investment participation by key employees of family offices would align their interests with those of family members and enable family members to attract highly skilled investment professionals who may not otherwise be attracted to work at a family office"); S. Rep. No. 111-176, at 76 (recognizing that some professionally run family offices may employ non-family members, who "may co-invest with family members, enabling them to share in the profits of investments they oversee, and better aligning" their interests with those of the family members). Plaintiff would have satisfied the prerequisites of a "key employee." See 17 C.F.R. 272.202(a)(11)(G)-1(d)(8).

same meaning as in section 202(a)(5) of the Advisers Act," which is codified at 15 U.S.C. § 80b-2(a)(5)); see also Clifford E. Kirsch, Investment Adviser Regulation: A Step-by-Step Guide to Compliance and the Law § 59:4.2[A] (3d ed. 2018) (stating, based on the broad definition of "company," "it should not matter what type of organizational structure the family decided to use when forming the family office").

Furthermore, even if the agreement were subject to a writing requirement, plaintiff's promissory estoppel claim would not necessarily be barred. We have adopted the Restatement's rule that a party may proceed under a theory of promissory estoppel even where the Statute of Frauds renders an oral contract otherwise unenforceable.

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.
>
> [Mazza v. Scoleri, 304 N.J. Super. 555, 560 (App. Div. 1997) (quoting Restatement (Second) of Contracts § 139(1) (Am. Law Inst. 1979)).]

See also Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc., 307 N.J. Super. 461, 471 (App. Div. 1998).

In determining whether justice requires a remedy on a theory of promissory estoppel, a court should consider:

> (a) the availability and adequacy of other remedies, particularly cancellation and restitution;
>
> (b) the definite and substantial character of the action or forbearance in relation to the remedy sought;
>
> (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;
>
> (d) the reasonableness of the action or forbearance;
>
> (e) the extent to which the action or forbearance was foreseeable by the promisor.
>
> [Restatement (Second) of Contracts § 139(2) (Am. Law Inst. 1981).]

"Restatement § 139 directs courts to assess the facts as the basis for judicious intervention when it appears that the statute of frauds may operate to support rather than to discourage the very wrong it was meant to avoid." 4 Corbin on Contracts § 12.8[I][C][1] (Murray ed., rev. ed. 2018). That "wrong" includes both the false assertion and false denial of an agreement. Promissory estoppel is especially appropriate where the promisor also falsely promised to provide a written memorialization. Ibid.

We discern no reason why the writing requirement of N.J.A.C. 13:47A-6.3 should preclude promissory estoppel where the Statute of Frauds would

not. Here, barring promissory estoppel would thwart the purpose of a writing requirement by leaving unremedied the injustice of defendant's false promises of employment and of providing a written memorialization. Plaintiff's lawsuit does not run afoul of N.J.S.A. 49:3-71(h), since plaintiff does not "base [his] . . . suit on the contract." Rather, he bases it on his detrimental reliance.

Defendant's arguments under FINRA and the unclean hands doctrine require only brief comment. Defendant seeks to avoid liability based on plaintiff's allegedly wrongful conduct toward his former employer. Defendant cites FINRA Rule 3270, which bars a registered person from obtaining compensation "as a result of any business activity outside the scope of the relationship with his or her member firm," absent "prior written notice." Defendant also contends that plaintiff had unclean hands because he breached his duty of loyalty to his prior employer by sharing his investment insights with defendant.

We need not decide whether plaintiff violated the FINRA rule, because defendant lacks standing to allege a FINRA violation against plaintiff's former employer. "[A] litigant usually has no standing to assert the rights of a third party." In re Six Month Extension of N.J.A.C. 5:91-1 et seq., 372 N.J. Super. 61, 85 (App. Div. 2004). Although a registered person's activities outside his or her member firm could conceivably "raise[] investor protection concerns,"

see Rule Change Relating to Outside Business Activities of Registered Persons, 74 Fed. Reg. 32668, 32669 (proposed June 30, 2009), no such concerns were at issue here because defendant, a sophisticated investor, only benefitted from plaintiff's advice.[9]

Nor does the doctrine of unclean hands – based on plaintiff's alleged disloyalty to his former employer – shield defendant from plaintiff's claim. Defendant has not shown that that plaintiff's alleged disloyalty caused defendant harm or that it related to his promise to plaintiff. See Untermann, 19 N.J. at 517 (stating that only "evil practice or wrong conduct in the particular matter or transaction" forming the basis of a claim will deprive a plaintiff the "right to justice in a court of equity (quoting Neubeck v. Neubeck, 94 N.J. Eq. 167, 170 (E. & A. 1922))); see also Sprenger v. Trout, 375 N.J. Super. 120, 136-37 (App. Div. 2005) (declining to apply the unclean hands doctrine where plaintiff's alleged wrong was against his employer, not defendants whom he hired to repair and customize his vehicle); Med. Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177, 181 (App. Div. 1951) (declining to apply the unclean hands doctrine where the wrongful conduct

---

[9] While we do not reach defendant's FINRA claim, we note that plaintiff did not seek commissions for his investment advice to defendant, nor was his future employment fairly characterized as compensation for that advice given. Rather, plaintiff offered the advice to demonstrate his investment acumen to defendant and his family.

was "insufficiently related to the basic controversy"). Here, defendant cannot demonstrate any injury he suffered from plaintiff's alleged breach of loyalty to his former employer.

In sum, we reject defendant's contention that plaintiff's claims were barred by the Securities Law, FINRA or the unclean hands doctrine.[10]

## B.

Plaintiff was entitled to present his claim for reliance damages to the jury, supported by his expert's opinion.

Plaintiff contended he was entitled generally to what he would have earned at his former job, had defendant's promise not induced him to quit, minus his subsequent earnings. Plaintiff contended that he earned, on a pure commission basis, an average of roughly $400,000 a year in his former position. According to his W-2 forms for 2009, 2011, 2012 and 2013, and his tax returns for 2010 and 2014, he earned $307,741 for nine months of 2009; $436,309 in 2010; $347,752 in 2011; $466,159 in 2012; $193,003 through mid-July 2013, when he gave two weeks' notice; and $116,935 in 2014, when

---

[10] Given our conclusion, we need not address plaintiff's arguments that (1) the Securities Law does not govern private employment arrangements; and (2) defendant was equitably estopped from raising the absence of a writing as a defense after assuring plaintiff he had sent one.

he secured alternative employment. Plaintiff testified that he earned $300,000 in 2015.

Plaintiff's expert took the average of 2010 through 2012, which was $416,740. He projected that plaintiff would have replicated that in 2013, although he admitted that plaintiff was earning at a lower annual rate when he resigned in mid-July. The expert discounted future earnings at plaintiff's former employer to account for the risk of unemployment; increased the earnings for inflation; and made various other adjustment in both projected and mitigation income. In calculating plaintiff's past earnings, the expert relied on plaintiff's answers to a questionnaire; W-2 earnings statements from his employer for 2009, 2011, 2012 and 2013; and excerpts of plaintiff's 2010 tax return.[11] In calculating his mitigation earnings, he relied on plaintiff's partial 2014 tax return and, for 2015, a W-2 and a bank statement reflecting the deposit of a bonus attributed to his 2015 performance.[12] Notably, even as of the trial in 2016, plaintiff's earnings did not reach their pre-resignation levels.

Defendant does not challenge the principle, established in Peck v. Imedia, Inc., 293 N.J. Super. 151, 167 (App. Div. 1996), that a person may

---

[11] In a pre-trial discovery ruling, plaintiff was permitted to withhold disclosure of his complete joint returns. However, at trial, in response to defendant's completeness objection, plaintiff introduced his complete 2010 return.

[12] Plaintiff introduced his complete 2014 tax return at trial.

obtain reliance damages on a promissory estoppel theory based on a broken promise of employment, even if the employment would have been at will. See also Pop's Cones, 307 N.J. Super. at 472 (approving reliance damages where hotel withdrew promise to lease space to plaintiff). Instead, relying on the Restatement, defendant contends permitting plaintiff reliance damages, based on the difference between past earnings and what he subsequently earned post-resignation, would leave him better off than had the promise been performed. See Restatement (Second) of Contracts § 90 cmt. d (stating that damages for a promissory estoppel claim "should not put the promisee in a better position than performance of the promise would have put him").

Defendant's argument is based on the false premise that plaintiff would have earned only $250,000 as defendant's employee and discounts the prospect of performance-based income as speculative. However, "[i]f the evidence affords a basis for estimating the damages with some reasonable degree of certainty, it is sufficient." Tessmar v. Grosner, 23 N.J. 193, 203 (1957). A jury need not calculate the amount of plaintiff's future performance-based income with certainty, so long as it was convinced that plaintiff would have earned enough, along with his base salary, to match his prior income. "The rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage

29

has resulted, mere uncertainty as to the amount will not preclude the right of recovery."  Ibid.; see also V.A.L. Floors, Inc. v. Westminster Cmtys., Inc., 355 N.J. Super. 416, 423 (App. Div. 2002) (stating "we do permit considerable speculation by the trier of fact as to damages").

A jury could reasonably conclude that plaintiff would not have quit a job at which he earned roughly $400,000 a year on a commission-only basis for a job paying $250,000 plus performance-based income, unless he believed himself likely to at least match his prior income.  Proceeding on this assumption, the jury would have effectively relied on plaintiff's past experience to predict his future performance.  That method is acceptable.  See V.A.L. Floors, 355 N.J. Super. at 425 (stating that "past profit experience on other projects . . . is widely accepted as relevant to a determination of damages based on lost profits" (quoting Tull v. Gundersons, Inc., 709 P.2d 940, 945 (Colo. 1985))).

We also reject defendant's argument to preclude reliance damages because plaintiff's proofs were insufficient to establish his past income. Plaintiff provided adequate proof – in the form of his oral testimony, his W-2s for 2009 and for 2011 through 2013, and his complete 2010 tax return – to establish his earnings at his prior firm.  Whether plaintiff suffered losses or gains from other investments or business pursuits – which undisclosed tax

documents may have reflected – had no bearing on his claim, which sought only to recover the earned income he lost in reliance on defendant's promise.

We also conclude that plaintiff's expert should be permitted to testify. Defendant argues that the expert should be barred primarily because he relied on inadequate documentation, as he saw only excerpts of plaintiff's tax returns; lacked information about how plaintiff earned his commissions (for example, whether he had multiple clients or a single client); and lacked documentation of other potential sources of income. Defendant contends this inadequate foundation rendered the expert's conclusions a net opinion.

We are unconvinced. An expert's opinion must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Richard Biunno, New Jersey Rules of Evidence 896 (2005)). "[T]estimony is not inadmissible simply 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Creanga v. Jardal, 185 N.J. 345, 360 (2005) (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)). An expert's opinion is inadmissible as a "net opinion" if it is a mere conclusion that lacks the essential "why and wherefore." Pierre, 221

N.J. at 54 (quoting <u>Borough of Saddle River v. 66 E. Allendale, LLC</u>, 216 N.J. 115, 144 (2013)).

Under that standard, plaintiff's expert was qualified to testify. He testified at an N.J.R.E. 104 hearing that he relied on information on which damages experts normally rely. He also relied on evidence that was admitted at trial – plaintiff's W-2s and tax return documents (although he did not have the complete 2010 return when he prepared his report). He used accepted measures to discount plaintiff's past income for the possibility of unemployment. The expert's partial access to plaintiff's tax returns, and his lack of information about the source of plaintiff's past commission income – which may be relevant to its replicability in the future – may be a fruitful area of cross-examination. But those alleged deficiencies do not render his opinion inadmissible.

III.

In summary, the trial judge should have recused herself because she created an appearance of impropriety by affirmatively responding to an ex parte communication inquiring whether she would preside over the trial. Having vacated the judge's challenged rulings, we conclude plaintiff was entitled to present claims for reliance damages, supported by his expert's

opinion and unrestrained by the Securities Law, FINRA, or the unclean hands doctrine.

Reversed in part, affirmed in part, and remanded for a new trial on damages. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3740-16T2